IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, OCALA DIVISION

CASE NO.: 5:10-cv-402-0c-LLAMH-GRJ

MELISSA CRABLE,

     Plaintiff,

vs.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

     Defendants.

_____/

## DEFENDANT'S NOTICE OF REMOVAL

Defendant, State Farm Mutual Automobile Insurance Co. ("State Farm"), by and through undersigned counsel, hereby files its Notice of Removal pursuant to 28 U.S.C. § 1446 and, in support thereof, states:

1. Plaintiff Melissa Crable ("Plaintiff") filed this action against her insurer State Farm on or about February 1, 2010, in the Circuit Court of the Fifth Judicial Circuit in and for Lake County, Florida, asserting a claim for benefits under the policy of insurance issued to her by State Farm. *See* Complaint, attached hereto as Exhibit A.

2. State Farm was served with process of the Complaint on February 10, 2010. *See* Notice of Service of Process, attached hereto as Exhibit B.

3. Pursuant to 28 U.S.C. § 1441, "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such

action is pending." "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different States." The action before this Court satisfies the requirements for diversity of citizenship jurisdiction; therefore, the Defendant hereby removes this action to this Court for all further proceedings.

4. Though a case ordinarily must be removed within thirty days after receipt by the defendant of the initial pleading, if the case is not removable based upon the initial pleading, "a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order, or other paper from which it may be first ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b).

5. This Court has original jurisdiction over this action because the parties to this action are diverse and the amount in controversy exceeds $75,000.00.

6. The parties to this action satisfy the requirements of diversity as they are citizens of different States. Plaintiff is a resident of the State of Florida. State Farm is an Illinois corporation with its principal place of business in Illinois. 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business").

7. In addition, the amount in controversy in this action exceeds the jurisdictional limits of this Court. Though at the time of filing it was not evident from the face of Plaintiff's Complaint that the amount in controversy met or exceeded the jurisdictional limits of this

Court, since the initial pleading in this action it has become apparent that the amount in controversy does exceed the sum or value of $75,000.

8. Plaintiff does not state the amount in controversy in her claim for insurance benefits under two policies of insurance issued to Plaintiff by State Farm. Rather, in her Complaint, Plaintiff states only that she is seeking damages in excess of $15,000. *See* Complaint, ¶ 1. In response to requests for admissions, Plaintiff has consistently disclaimed any ability to confirm whether or not she is seeking damages in an amount in excess of the jurisdictional limits of this Court. *See* Plaintiff's Responses to Defendant's First, Second and Third Requests for Admissions to Plaintiff. However, in her deposition, taken July 20, 2010, Plaintiff provided testimony regarding the value of her claim so that the Defendant is now able to show, by a preponderance of the evidence, that the amount in controversy in this action exceeds $75,000.

9. Specifically, Plaintiff confirmed in her deposition that she is seeking to recover as damages in this case the value of medical bills issued for treatment that she received from Dr. Deukmedjian, South Lake Wellness, Mid-Florida Imaging, and for the emergency room services received at South Lake Hospital. *See* deposition of Melissa Crable, pp. 75, 80-82. A copy of the deposition of Melissa Crable is attached hereto as Exhibit C. A copy of the medical bill issued by Dr. Deukmedjian for the treatment of Plaintiff in the amount of $63,236.22 is attached hereto as Exhibit D. A copy of South Lake Wellness & Injury's invoice for services provided to Plaintiff in the amount of $8,036.91 is attached hereto as Exhibit E. A copy of the itemized special damages claimed by Plaintiff reflecting bills in the amount of $2696.45 from Mid-Florida Imaging for diagnostic studies of the Plaintiff and

bills in the amount of $583.00 for emergency room treatment is attached hereto as Exhibit F. The aggregate of these claims for economic damages equal $74,761.36, an amount which approaches, but does not exceed, the jurisdictional limits of this Court.

10. In addition to her claim for economic damages, however, Plaintiff asserted a claim for non-economic damages as well. Before her deposition, the Defendant was unable to identify the nature or extent of the non-economic damages claimed by the Plaintiff as Plaintiff had, prior to her deposition, given no explanation of the pain and suffering she claimed to have endured giving rise to her claim for non-economic damages. Further, in response to requests for admissions, Plaintiff professed an inability to estimate the value of the non-economic damages at issue in this action. However, following the July 20, 2010, deposition of the Plaintiff, it is now evident that the amount in controversy in this action does, indeed, exceed $75,000.00.

11. In her deposition, Plaintiff testified that, as a result of the accident which led to her claim for insurance benefits, she was in a lot of pain. She missed work the day following the accident, was stricken with headaches which caused her to have to leave work early on several occasions, and ultimately resorted to surgical intervention to repair cervical damage to alleviate her pain and her headaches. Plaintiff's deposition, pp. 82-84. In addition, since the time of the accident, Plaintiff has become pregnant and has begun to experience back pain which she alleges to be above and beyond the severity of back pain that she would have experienced with pregnancy had she not injured her back. Plaintiff's deposition, pp. 89-91. Finally, Plaintiff claims that State Farm "hurt her" in the manner in which they handled her claim for property damage and personal injury. Plaintiff's deposition, pp. 78-80. Plaintiff

claims to have been hurt emotionally by the way in which she was treated. Plaintiff's deposition, p. 80.

12. Reviewing Plaintiff's July 20, 2010 testimony in which Plaintiff for the first time set forth the nature and description of her claim for non-economic damages, and despite Plaintiff's many protestations that she cannot estimate the value of her claim, the preponderance of the evidence shows that Plaintiff is claiming non-economic damages of a nature and severity to exceed the minimal value of $250.00. By so doing, Plaintiff has asserted claims against State Farm, the total value of which exceeds $75,000.00, exclusive of costs and interest.

13. Because this Notice of Removal is filed within thirty days of the date of Plaintiff's July 20, 2010 deposition in this matter, wherein the Defendant first received the information establishing that Plaintiff's claim was within the jurisdictional limits of this Court, this Notice of Removal is timely filed. 28 U.S.C. § 1446(b).

14. In accordance with Rule 4.02(b), Local Rules for the Middle District of Florida, the Defendant serves herewith a copy of "all process, pleadings, orders, and other papers or exhibits of every kind, including depositions" on file in the state court and has served on all parties and the clerk of the State Court a copy of this Notice of Removal pursuant to 28 U.S.C. § 1446(d), a copy of which is attached hereto as Exhibit G.

WHEREFORE, the Defendant, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, hereby removes this action to this Court and respectfully requests that this Court take jurisdiction over the above-captioned matter for all further proceedings.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Removal has been furnished by U.S. Mail this _16_ day of August, 2010, to Ryan Hayes, Esq., Morgan & Morgan, PA, P.O. Box 4979, Orlando, FL 328022.

**DALE T. GOBEL**
Florida Bar No.: 980439
**KIMBERLY D. WEBB**
Florida Bar No.: 537306
Gobel Flakes, LLC
P.O. Box 4467
189 S. Orange Avenue, Suite 1430
Orlando, Florida  32802-4467
Telephone: (407) 455-5165
Facsimile: (407) 455-5166
Attorneys for Defendant

*First-Choice Reporting Services, Inc.*                                1

```
 1                    IN THE CIRCUIT COURT OF THE
                      FIFTH JUDICIAL CIRCUIT, IN AND
 2                    FOR LAKE COUNTY, FLORIDA

 3                    CASE NO. 10-CA-551

 4

 5   MELISSA CRABLE,

 6         Plaintiff,

 7   vs.

 8   STATE FARM MUTUAL AUTOMOBILE
     INSURANCE COMPANY,
 9
           Defendant.
10

11      *    *    *    *    *    *    *    *    *    *    *

12

13

     DEPOSITION OF:     MELISSA CRABLE
14
     DATE TAKEN:        July 20, 2010
15
     TIME:              Beginning at 9:30 a.m.
16                      Concluding at 11:54 a.m.

17   PLACE:             First Choice Reporting & Video
                        303 N. Sinclair Avenue
18                      Tavares, Florida 32778

19   REPORTED BY:       Susan L. Davis, Professional
                        Court Reporter and Notary
20                      Public, State of Florida at Large

21

22

23      *    *    *    *    *    *    *    *    *    *    *

24

25
```

**EXHIBIT C**

1    APPEARANCES:

2

3

4

5         RYAN J. HAYES, ESQ.
          Morgan & Morgan, P.A.
6         20 North Orange Ave., 16th Floor
          Orlando, Florida 32801
7         407.420.1414

8              APPEARING ON BEHALF OF THE PLAINTIFF;

9

10

11

12        DALE T. GOBEL, ESQ.
          Gobel Flakes, LLC
13        189 S. Orange Avenue, Ste. 1430
          Orlando, Florida 32801
14        407.455.5165

15             APPEARING ON BEHALF OF THE DEFENDANT.

16

17

18

19

20

21

22

23

24

25

*First-Choice Reporting Services, Inc.*                    3

1                      C O N T E N T S

2

TESTIMONY OF MELISSA CRABLE

3

        Direct Examination by Mr. Gobel              4

4

CERTIFICATE OF OATH                                  94

5

COURT REPORTER'S CERTIFICATE                         95

6

7

8

9                  -    -    -    -    -

10

11

12

13                 S T I P U L A T I O N S

14        It is hereby agreed and so stipulated by and

15    between the parties hereto, through their respective

16    counsel, that the reading and signing of the transcript

17    is expressly waived by the Deponent.

18

19

20

21                 -    -    -    -    -

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE COURT REPORTER:  Would you raise your |
| 3 | right hand, please? |
| 4 | Do you solemnly swear or affirm the following |
| 5 | testimony will be the truth, the whole truth, and |
| 6 | nothing but the truth? |
| 7 | THE WITNESS:  Yes. |
| 8 | WHEREUPON, |
| 9 | MELISSA CRABLE |
| 10 | called as a witness, having been first duly |
| 11 | sworn, was examined and testified as follows: |
| 12 | DIRECT EXAMINATION |
| 13 | BY MR. GOBEL: |
| 14 | Q    Would you please state your full name for the |
| 15 | record? |
| 16 | A    Melissa Janeen Crable. |
| 17 | Q    Is Jeanine, J-E-A-N-I-N-E? |
| 18 | A    J-A-N-E-E-N. |
| 19 | Q    And what's your social? |
| 20 | A    ████████████ |
| 21 | MR. HAYES:  And if that's going to be filed, |
| 22 | I'd just request that you redact it. |
| 23 | MR. GOBEL:  Okay. |
| 24 | BY MR. GOBEL: |
| 25 | Q    ████████████ |

```
 1        A     (Witness nods head.)

 2        Q     And your date of birth?

 3        A     ███████ 1982.

 4        Q     Are you, where do you currently live?

 5        A     In Mascotte.

 6        Q     And what's your address there?

 7        A     36 Bay Ridge Loop.

 8        Q     How long have you lived there?

 9        A     I believe it's three, a little over three

10   years.

11        Q     Who do you live there with?

12        A     My spouse.

13        Q     What's his name?

14        A     Jeffrey.

15        Q     Crable?

16        A     Yes.

17        Q     Does anybody else live there with you?

18        A     Right now his friend is staying with us.

19        Q     What's his name?

20        A     Keith Westendorf.

21        Q     W-E-S-T-E-N-D-O-R-F?

22        A     Uh-huh.

23        Q     How long has Keith Westendorf been living with

24   you?

25        A     For four months.
```

*First-Choice Reporting Services, Inc.*                    **6**

1      Q    And why is he living with you?

2      A    Because he's waiting to move back up to

3    Chicago.

4      Q    And what's he doing here in Central Florida?

5      A    He went to school.

6      Q    Where?

7      A    The Motorcycle Mechanic Institute.

8      Q    MMI?

9      A    Uh-huh.

10     Q    And he went to school and lived with you

11   during the time that he went to school?

12     A    No.  He lived over by school because he didn't

13   have a license, so one of his friends was taking him to

14   school.  He just moved in with us while he's waiting to

15   go back to Chicago.

16     Q    I don't understand.  Why he is waiting to go

17   back to Chicago?

18     A    Because he had some court issues with his

19   driver's license.

20     Q    Is he employed?

21     A    No.

22     Q    Is your husband from Chicago?

23     A    Uh-huh.

24     Q    Yes?

25     A    Uh-huh.  Yeah.

1      Q    Okay.  Have you ever had your deposition taken

2    before?

3      A    No.

4      Q    Okay.  One thing you need to remember is to

5    verbalize your answers.  In other words, it's really

6    difficult for her to take down an uh-huh or huh-uh's,

7    that type of thing, so try to say yes or no.

8      A    Okay.

9      Q    If you don't, I'll remind you.  And if you say

10   "uh-huh", I might say yes --

11     A    Okay.

12     Q    -- prompting you to give a verbal answer.  Do

13   you understand?

14     A    Yes.

15     Q    Okay.  Where did you live before you lived

16   at -- first of all, how long have you been married to

17   Jeff Crable?

18     A    Five years.

19     Q    Where did you live before you lived at 36 Bay

20   Ridge Loop in Mascotte?

21     A    With my parents in Winter Garden.

22     Q    Did Jeff live with you and your parents?

23     A    My husband was a marine.  He was stationed in

24   North Carolina.

25     Q    Where in North Carolina?

*First-Choice Reporting Services, Inc.*                                    **8**

1        A       Camp LeJeune.

2        Q       So you lived at home with your parents during

3    the first two years of your marriage?

4        A       Yes.  Well, he moved down and lived with our

5    parents about two months after we got married because he

6    was on leave.  He had surgery.

7        Q·      What kind of surgery?

8        A       He tore his ACL in the military.

9        Q       Okay.  So did you live, how long did you live

10   at your parents' house before you lived at 36 Bay Ridge

11   Loop?

12       A       I'm trying to -- two, two years.

13       Q       What are your parents' names?

14       A       Patricia and Russell Reda.

15       Q       What's the last name?

16       A       Reda, R-E-D-A.

17       Q       And what's that address in Winter Garden?

18       A       2689 Groveview Drive.

19       Q       Where did you live before that two-year period

20   of time that you lived with your parents?

21       A       Up in Chicago.

22       Q       Where in Chicago?

23       A       I lived in Lockport before I moved down to

24   Florida.

25       Q       Lockport?

*First-Choice Reporting Services, Inc.* 9

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | Okay.  Do you have an address there? |
| 3 | A | I don't remember.  It was an apartment. |
| 4 | Q | Do you remember the name of the apartment |
| 5 | complex? | |
| 6 | A | I don't. |
| 7 | Q | Was it an apartment complex? |
| 8 | A | Huh? |
| 9 | Q | Was it an apartment complex? |
| 10 | A | It was an apartment complex. |
| 11 | Q | And it was in Lockport, Chicago? |
| 12 | A | Lockport, Illinois. |
| 13 | Q | Lockport, Illinois. |
| 14 | | Where you employed in Chicago? |
| 15 | A | Yes. |
| 16 | Q | Where you employed? |
| 17 | A | Ace Hardware Corporation. |
| 18 | Q | What did you do for Ace Hardware? |
| 19 | A | I was in their IT department. |
| 20 | Q | What did you do at their IT department? |
| 21 | A | Order entry.  I took orders for the stores. |
| 22 | Q | Did you do that for customers or did you do |
| 23 | it, like a store would call in and say, we need a | |
| 24 | thousand widgets, whatever? | |
| 25 | A | The store would use a machine, and they would |

1   send it through the phone or through the computer and it

2   would pop up on my computer screen, and we would monitor

3   to make sure that there wasn't an issue.

4        Q    Okay.  So you were the main warehouse for Ace

5   Hardware?

6        A    I was the corporation.  It was at corporate.

7        Q    Okay.  How long did you work at Ace Hardware?

8        A    I believe I worked at Ace Hardware, I was a

9   senior, just graduated my senior year of high school,

10  and I worked there up until I moved down here to

11  Florida.  So I would probably say, guessing, three

12  years, something like that.

13       Q    So when was your senior year of high school?

14       A    I graduated in 2000.

15       Q    So you started working there in 2000?

16       A    Yes.

17       Q    How did you get that job?

18       A    My mother worked for Ace Hardware.

19       Q    How long did you work at Ace?

20       A    I believe three years.

21       Q    Three years?  Okay.

22       A    That's a guess.  I'm unsure.

23       Q    You worked there until you moved to Florida?

24       A    Yes.

25       Q    Okay.  And sounds like both you and your

1    parents moved to Florida at the same time?

2         A    I moved six months after they did.

3         Q    Did your dad retire?

4         A    Yes.

5         Q    And did you get a job when you came to

6    Florida?

7         A    Yes.

8         Q    Okay.  What period of time was it or what year

9    was it that you moved to Florida?

10        A    I believe it was '03.  August of '03.

11        Q    And you were employed at Ace up until the time

12   you moved to Florida?

13        A    Yes.

14        Q    And did you get a job when you came to

15   Florida?

16        A    Yes.

17        Q    With who?

18        A    The Animal Clinic of Windermere.

19        Q    And when did you start working at the Animal

20   Clinic of Windermere?

21        A    I believe it was in the fall.  I don't

22   remember the exact date.

23        Q    Fall of 2003?

24        A    Uh-huh.

25        Q    What was your job there?

1        A     Receptionist.

2        Q     How long did you work at the Animal Clinic of

3    Windermere?

4        A     Two and a half years.

5        Q     Did you have any other responsibilities other

6    than answering the phone?

7        A     I was, did all the ordering.

8        Q     For supplies?

9        A     Yes.

10       Q     Anything else?

11       A     I would do the checkouts, as well the billing.

12       Q     Okay.   Where did you work after the Animal

13   Clinic of Windermere?

14       A     I worked for Wyndham Worldwide, Wyndham

15   Vacation Resorts.

16       Q     How long did you work there?

17       A     I'm there now.

18       Q     Still employed there now?

19       A     Uh-huh.

20       Q     When did you start with Wyndham?

21       A     I left the animal clinic February two years

22   ago.

23       Q     So February in 2008?

24       A     Yes.

25       Q     February, 2008, to present?

```
 1        A     Uh-huh.

 2        Q     Yes?

 3        A     Yes, sir.

 4        Q     Have you had any other jobs that you have not

 5  told me about?

 6        A     No.

 7        Q     Have you lived anywhere else that you haven't

 8  told me about?

 9              You said you lived in an apartment in

10  Chicago --

11        A     In Lockport, yeah.

12        Q     -- before you moved here?

13        A     Correct.

14        Q     And I assume you moved to that apartment when

15  you graduated from high school?

16        A     When my parents moved to Florida.

17        Q     So you only lived there for six months?

18        A     Yes.

19        Q     And before that you lived at your --

20        A     My parents' address.

21        Q     -- parents' home, right?  Or your home that

22  you grew up in?

23        A     Uh-huh.

24        Q     Yes?

25        A     Yes, sir.
```

*First-Choice Reporting Services, Inc.*                    **14**

1      Q      What was that address?

2      A      That was in Woodridge.  I don't know that

3   address.  I don't remember that address anymore.

4      Q      That's where you grew up?

5      A      That, I did not grow up in that house.  I grew

6   up, we moved there when I was senior in high school to

7   that house.

8      Q      Okay.  You were involved in an automobile

9   accident on November 12, 2008?

10     A      Correct.

11     Q      That's why you filed this lawsuit?

12     A      Correct.

13     Q      And what injuries are you alleging that you

14   sustained in that accident?

15     A      My neck and my lower back.

16     Q      Before this accident of November the 12th,

17   2008, had you ever been involved in any other automobile

18   accidents?

19     A      Yes.  When I was in high school.

20     Q      Tell me about that.

21     A      I was, I was driving down the road and a car

22   pulled out in front of me, flipped a U-turn in front of

23   me, and I slammed on my brakes and the car behind me did

24   not stop and rear ended me.  Well, tried to avoid me and

25   hit me.

## *First-Choice Reporting Services, Inc.*                15

1      Q      So you were rear ended in that accident?

2      A      They hit my passenger side corner panel, yeah.

3      Q      So you were turning into your high school?  Is

4  that what you were telling me?

5      A      No.  I was driving down the road and the car

6  pulled a U-turn and the car behind me tried to avoid me

7  when I stopped and clipped, hit my back end.

8      Q      Okay.  Where did that accident happen?

9      A      Woodridge.

10     Q      What is your maiden name?

11     A      Reda, R-E-D-A.

12     Q      Have you ever been known by any other names

13  other than Crable or Reda?

14     A      No.

15     Q      What road did that happen on in Woodridge?

16     A      I believe it was Woodward.

17     Q      Were you injured in that accident?

18     A      No injuries.

19     Q      Did you ever go to the hospital for that

20  accident?

21     A      No.

22     Q      Did any emergency personnel come to the scene

23  of the accident?

24     A      No.

25     Q      So no police officers?

*First-Choice Reporting Services, Inc.*          **16**

1      A    Just the police officer.  I was just -- it

2   happened by the police station.

3      Q    So an ambulance did not come?

4      A    No.

5      Q    No fire trucks came?

6      A    No.

7      Q    And so were you ever offered any type of

8   medical assistance at the scene?

9      A    I don't remember.  It was long ago.

10     Q    Did you ever go to a chiropractor or a massage

11  therapist or an acupuncturist or any type of medical

12  professional for that accident?

13     A    No.

14     Q    Did you ever go to your primary care doctor

15  for that accident?

16     A    Yes.  Just to get checked out, but I had no

17  issues.

18     Q    What was your primary care doctor's name?

19     A    Dr. Patel.

20     Q    Was he always your primary care doctor in

21  Chicago?

22     A    Yes.

23     Q    Where is his office located?

24     A    In Woodridge.

25     Q    Do you know what road?

1      A      On 75th Street.

2      Q      When you went in to see Dr. Patel following

3  this automobile accident in Woodridge, what did you

4  complain of?  What did you tell Dr. Patel was wrong with

5  you?

6      A      Nothing.  My parents just wanted me to get

7  looked at.

8      Q      So you had no complaints?

9      A      I had no complaints.

10      Q      Okay.  What year was that accident?

11      A      I want to say 2000.

12      Q      Okay.  Other than the 2000 automobile accident

13  in Woodridge, have you ever been involved in any other

14  automobile accidents?

15      A      No.

16      Q      Either as a driver or a passenger?

17      A      No.

18      Q      Have you ever been involved in any incident

19  where you were injured and sought medical attention?

20      A      No.

21      Q      And by that, I mean have you ever slipped and

22  fall -- had a slip and fall where you went to the

23  doctor?  Have you ever been in a sporting incident where

24  you went to the doctor?  Have you ever, you know, had a

25  box fall off a shelf and hit you in the head and had to

1   go to the doctor?  Have you ever had any type of injury

2   where you had to go to the doctor?

3        A    No.

4        Q    None of that?

5        A    No.

6        Q    So you have never been to the doctor for any

7   type of injury?

8        A    No.

9        Q    You never had a cut on your finger that you

10  had to have stitches in?

11       A    No, never had stitches.

12       Q    Okay.  Never had a brace, never had a broken

13  arm?

14       A    Never had any broken bones.

15       Q    Never been to a chiropractor before?

16       A    No.  This was my first time with this current

17  accident.

18       Q    Before this accident of November the 12th,

19  2008, had you ever been to a chiropractor?

20       A    No.

21       Q    Ever been before this accident of November,

22  2008, to a massage therapist or acupuncturist or a

23  physical therapist?

24       A    No.

25       Q    Have you ever been injured at any job you have

*First-Choice Reporting Services, Inc.*                              **19**

1    ever had?

2         A    No.

3         Q    You never had a workers' comp claim?

4         A    No.

5         Q    Okay.  Tell me about this accident of November

6    the 12th, 2008.

7         A    I was driving home on Highway 27.  The car in

8    front of me had stopped, so I had stopped.  And then the

9    next thing I know was I felt glass (indicating), and I

10   heard glass shatter.

11        Q    Okay.  Did you have your seat belt on?

12        A    Yes.

13        Q    Did any part of your body strike any interior

14   portion of your car?

15        A    Well, my head hit my, my headrest.  I remember

16   flinging back and hitting my head and saying, Ow.

17        Q    Okay.  Did you hit your head on the dash?  Did

18   you --

19        A    No.  I hit it on, just really hard on the

20   headrest, my headrest (indicating).

21        Q    Did your air bags deploy?

22        A    No.

23        Q    Did you have air bags?

24        A    Yes.

25        Q    What kind of car were you driving?

## *First-Choice Reporting Services, Inc.* 20

1     A    An '08 Chevy Malibu SS.

2     Q    You said you heard glass.  What glass in your

3   car broke?

4     A    My back windshield shattered and came in.

5     Q    You say it came in.  What do you mean?

6     A    It exploded inward.

7     Q    It shattered into the interior of the car?

8     A    Yes.

9     Q    A lot of times you'll see where the glass just

10  caves in.  Was it like that or was it just gone?

11    A    It was completely gone.  It was all over my

12  back seat and my front seat and me.

13    Q    Were you cut?

14    A    I, the EMT was looking at my head.  They told

15  me I had glass stuck in my head, but that's, they

16  couldn't really do anything to pull it out because it

17  was little pieces (indicating).

18    Q    Were you bleeding?

19    A    I was not bleeding.

20    Q    Did you ever have an X-ray that showed glass

21  in your head or have any glass removed from your head?

22    A    No.  It was little, they said it was little

23  fragments that would have to work itself out.

24    Q    So no glass was ever removed in your head?

25    A    No.

1          Q     And you never bled?

2          A     I didn't bleed, no.

3          Q     Did you ever see any of these pieces of glass

4     that were allegedly in your head?

5          A     I felt them.  I mean, I felt, when I would, if

6     I washed my hair, I felt something in there.  Like, it

7     wasn't pieces, it was, I guess, splinters of the glass

8     shattering, but I, I felt something was there, but it,

9     they told me just to wash my hair out with cold water

10    and the glass pieces will slowly work their way out.

11         Q     Okay.  But you never bled from it at all?

12         A     No.

13         Q     Did you ever see any of these glass pieces

14    when they worked their way out?

15         A     Huh-uh.

16         Q     No?

17         A     No.

18         Q     Have they worked their way out?

19         A     Yes.

20         Q     You don't feel it?

21         A     I don't feel it anymore.

22         Q     Okay.  Other than hitting your head on the

23    headrest, did you hit any other part of your body inside

24    the car?

25         A     I don't remember.  I don't believe so.

1    Q    And in that Malibu, did it have -- I'm trying

2  to understand how glass would get in the back of your

3  head.  Did it have a, some headrests, there's like a,

4  you can see through the headrest, like it's a square.

5  Is that how your headrest was?

6    A    Uh-huh.

7    Q    Yes?

8    A    Yes, sir.

9    Q    So it's a square headrest and the middle of

10 the square is empty; is that correct?

11   A    Correct.

12   Q    You said there was a car stopped in front of

13 you?

14   A    Uh-huh.  Yes, sir.

15   Q    What kind of car was that?

16   A    I don't remember.

17   Q    Did your car hit that car?

18   A    After I was hit, it pushed me.

19   Q    So you were pushed into the car in front of

20 you?

21   A    Yes, sir.

22   Q    Do you recall what color the car was that in

23 was in front of you?

24   A    It was dusk, so I don't remember.  It was

25 getting dark.

1    Q    Where were you coming from on that day?

2    A    My parents' house.

3    Q    And where were you going?

4    A    Home.

5    Q    And that's on Bay Ridge?

6    A    Yes, sir.

7    Q    What kind of car was it that hit your car?

8    A    An SUV.

9    Q    Do you know what kind?

10   A    I believe it was an old Yukon or Denali.  It

11   was an old, it was a big truck, an old like Yukon SUV.

12   Q    Okay.  And did emergency vehicles arrive at

13   the scene of the accident?

14   A    Yes.

15   Q    Did you stay in your car until the emergency

16   vehicles got there?

17   A    Yes.  I couldn't get out of my car.

18   Q    Why could you not get out of your car?

19   A    My door would not open.

20   Q    Did you try to get out of the passenger's

21   door?

22   A    No.

23   Q    Why not?

24   A    Because I didn't want to move and it was on a

25   busy road.

*First-Choice Reporting Services, Inc.*                    24

1        Q    Okay.  Did you ever speak to the driver of the
2    other vehicle, either of the other vehicles?
3        A    Yes.  At the scene.
4        Q    Okay.  At the scene of the accident who did
5    you talk to?
6        A    The guy that hit me.
7        Q    Do you know what his name was?
8        A    I don't.
9        Q    And what did you say to the person that hit
10   you?
11       A    What did I say?  I asked him if he was okay.
12       Q    And what did he say?
13       A    He said yes.
14       Q    And did he ask you if you were okay?
15       A    Yes.
16       Q    And what did you say?
17       A    I said, As of right now, I think I'm fine.
18       Q    Did you have any other conversations with the
19   driver of the other vehicle?
20       A    No.
21       Q    That's the only words that you exchanged?
22       A    Uh-huh.
23       Q    Yes?
24       A    I was shaken up.  Yes.
25       Q    Are those the only words that you exchanged?

1        A    Yes.

2        Q    Did you speak to the driver of the vehicle

3    that you hit?

4        A    No.

5        Q    Did you see him get out of the car?

6        A    Yes.

7        Q    Can you recall, can you describe that driver?

8        A    Not too well.  I don't really remember him too

9    much.

10       Q    Tell me what you remember.

11       A    I don't remember.  He could have been Hispanic

12   or he could have been African-American.  I don't, I

13   don't remember.

14       Q    What about --

15       A    I just remember him saying that he hurt his

16   knee.

17       Q    So you did have some kind of discussion with

18   the driver of the car in front of you?

19       A    I just heard him say it to the EMT.

20       Q    Did you hear the driver of the car that hit

21   you say anything else?

22       A    I heard them check his levels because he's

23   diabetic.

24       Q    Anything else that you overheard the driver of

25   the other vehicle say, the driver of the car that hit

1   you, the SUV?

2          A    Just that he thinks his insulin was low.

3          Q    At the scene of the accident?

4          A    Yes.

5          Q    Did you hear the emergency medical personnel

6   respond to him at all on that?

7          A    They gave him insulin on the scene.

8          Q    How did you get out of your car?

9          A    The Fire Department got me out.

10         Q    How did they get you out?

11         A    They had to pry open my door.

12         Q    Do you remember having any discussions with

13  anybody from the Fire Department or the ambulance?

14         A    They just, they just told me that they were

15  going to move my car because they were worried that if I

16  got in the car and moved it, that the air bag would

17  deploy.  That's really all.  They just checked me over.

18         Q    They checked you over at the scene?

19         A    Yeah.  Looked at my head, made sure I didn't

20  have any cuts.

21         Q    Did they offer you assistance, or

22  transportation to the hospital?

23         A    They asked me if I would like to go to the

24  hospital.  At that point I was just waiting on my

25  husband to come from home to get me to, because I didn't

1   want to go in the ambulance.

2        Q     Why not?

3        A     I just, I didn't feel that it was a big enough

4   emergency to be put in an ambulance instead of just

5   having my husband take me to the emergency room.

6        Q     So did your husband arrive at the scene?

7        A     Yes, sir.

8        Q     How long were you at the scene before your

9   husband got there?

10       A     Probably anywhere between 40 minutes to an

11  hour.

12       Q     How far was your house from the scene of the

13  accident?

14       A     About 20 minutes.

15       Q     Did you hear anyone else that was in the

16  accident make any other comments?

17       A     No.

18       Q     For example, did you hear the ambulance driver

19  say anything else?

20       A     No.

21       Q     Did the ambulance driver say anything else to

22  you that you haven't related to me here today?

23       A     No.

24       Q     What about the firemen?

25       A     No.

1      Q    What about the drivers of either of the other

2   cars, did they say anything else that you haven't

3   related here to me today?

4      A    No.

5      Q    Did you call your husband from the scene of

6   the accident?

7      A    Yes.

8      Q    And you used your cell phone?

9      A    Yes.

10      Q    And what service did you have?

11      A    AT&T.

12      Q    And do you still have that same service?

13      A    Yes.

14      Q    And do you still have the same phone number?

15      A    I don't remember.

16      Q    What's your phone number now?

17      A    (407)748-2664.

18      Q    Have you changed your number at some point?

19      A    It, I'm trying to remember.  I had Nextel

20   before, but that was a 630 area code.  So I believe

21   that's the number I had (indicating).

22      Q    Were you on the phone with anybody before the

23   accident?

24      A    Yes.

25      Q    Who were you on the phone with before the

```
 1   accident?
 2        A    My friend, Traci (ph).
 3        Q    You were on the phone with her at the time of
 4   the accident?
 5        A    Yes.  She heard the whole accident.
 6        Q    What is Traci's name?
 7        A    Traci Lord, L-O-R-D.
 8        Q    Where does she live?
 9        A    Winter Park.
10        Q    Where in Winter Park?
11        A    I'm not, I'm unsure.  By the Riverwalk
12   somewhere.  I'm unsure.
13        Q    Riverwalk?
14        A    Yeah.
15        Q    That's the name of the apartments?
16        A    No.  I don't know exactly her address.  I
17   don't know where she lives in Winter Park.
18        Q    Okay.  Is she married?
19        A    No.
20        Q    Does she live with anyone else?
21        A    Her parents and her daughter.
22        Q    What are her parents' names?
23        A    I don't...
24        Q    Do you know what road she lives on?
25        A    No.
```

1      Q      When you say she lives near Riverwalk, what do

2  you mean?

3      A      She lives near the Riverwalk.  I've never

4  really been up to the Winter Park area, so I'm

5  unfamiliar with the area, but I just know she lives by

6  the Riverwalk.

7      Q      Okay.  So you have just never been to her

8  house?

9      A      Correct.

10     Q      How do you know her?

11     A      We work together.

12     Q      At the animal hospital or...

13     A      No, at Wyndham.

14     Q      Who is your supervisor at Wyndham?

15     A      Jenera Kennedy.

16     Q      How do you spell that?

17     A      J-E-N-E-R-A and Kennedy.

18     Q      Is she still your manager?

19     A      She, actually they rotated managers.  She

20  wasn't my manager at the time of the accident.

21     Q      Who was?

22     A      Hawani, H-A-W-A-N-I, A-G-A.  She no longer

23  works for Wyndham though.

24     Q      And who was, was it Jenera after Hawani?

25     A      No.  Celeste.

*First-Choice Reporting Services, Inc.*                           31

1        Q     What is Celeste's last name?

2        A     S -- oh, I can't even spell it.  I don't know

3    her last name.  I don't remember her last name.

4        Q     Other than talking with Traci, were you

5    talking with anyone else on that trip between your

6    parents' house and your home?

7        A     No.

8        Q     So the only phone calls you made on that day

9    were to Traci and following the accident, to your

10   husband?

11       A     Between, from leaving my mother's house to --

12   I did call my mom to tell her that I was in an accident.

13       Q     And did your mother ask you if you were okay?

14       A     Yes.

15       Q     And what did you tell her?

16       A     I said, Right now I think I'm okay.

17       Q     Okay.  And did you, when the accident

18   happened, was Traci -- Traci was on the phone, right?

19       A     I, I, she was on the phone with me, yes.  And

20   I called her because I couldn't, after I got hit and we

21   were, I was in the car, I was looking around for my cell

22   phone because it flew out of my hand or, and I couldn't

23   find it, but it was on the floor and the phone was

24   disconnected.

25       Q     Okay.

1      A    So I called her back -- no, she called me back

2    and she asked if I was in an accident because she heard

3    glass shattering and tires.  And I told her yes and that

4    I would have to call her back because I have to call my

5    husband.

6      Q    Okay.  What did you do after the accident?

7      A    My husband took me home, and I started to get,

8    have pain.  I was starting to get sore and then he had

9    me lay in bed for the night.  He wouldn't let me get out

10   of bed, so I laid in bed.  And then the next morning I

11   was still sore, so my parents drove from their house in

12   Winter Garden and picked me up and took me to the

13   emergency room.

14     Q    Why didn't your husband take you to the

15   emergency room?

16     A    He didn't take me because he had to go to work

17   in the morning.  He didn't, he worked in Ocala.

18     Q    Where was he working at the time?

19     A    South Lake -- Southland Construction Company.

20     Q    And what symptoms were you feeling when you

21   woke up the next morning?

22     A    My back was extremely sore and my neck was

23   extremely sore and my arms were kind of tingly and so

24   were my legs.

25     Q    Okay.  When you say your back was sore, where

1    specifically on your back were you sore?

2         A    I was sore right into my lower back

3    (indicating) and then I was also sore into my shoulder

4    blades, between my shoulder blades into my neck area.

5         Q    So if we are talking about your back being

6    sore, you're talking about the area down near your

7    beltline or above that area?

8         A    My lower back area (indicating).

9         Q    And I'm just trying to define that a little

10   bit more because people mean different things when they

11   say that.

12        A    Yes.

13        Q    When you say your lower back area, do you mean

14   the area near your beltline or above that?

15        A    My beltline and a little bit above it.

16        Q    And then you also had separate symptoms

17   between your shoulder blades?

18        A    Uh-huh.   I was sore across the center of my

19   back, across my shoulder blade area.   That went into my

20   neck.

21        Q    Then you said your arms and legs were tingly.

22   What do you mean by that?

23        A    They were just, they were numb.   They were, I

24   felt things, but they just, they weren't, they didn't

25   feel normal.   They didn't feel right.   They were tingly.

```
 1    Like, it felt like my leg fell asleep and woke up and
 2    that's the sensation I had.
 3        Q    By the way, what damage was done to your
 4    vehicle?
 5        A    The rear end was pretty much missing.
 6        Q    What do you mean missing?
 7        A    Like it was pretty much gone from the damages.
 8    It went all the way up to my tire.  The car was gone
 9    from my tire.  I don't know how to explain it.
10        Q    You mean the, your car was crunched into your
11    tire, to the wheel well?  Is that what you're trying to
12    explain?
13        A    Yeah, all the way to the tire.  The glass was
14    missing.  My front end and my hood were all pushed in.
15    And my driver's side, the both doors would not open or
16    close properly.
17        Q    Were they jammed?
18        A    Yeah, from the shiftment (ph) of the car.
19        Q    Okay.  What about to the front of your
20    vehicle?
21        A    The front end was also pushed in and smushed
22    forward from being pushed into the car in front of me.
23    Yeah, my back bumper and everything was ripped right off
24    the car.
25        Q    What did they tell you to do -- well, first of
```

1    all, you said your parents brought you to the hospital

2    the next day?

3         A    Yes.

4         Q    Did you go in the morning, the afternoon?

5    What time did you go?

6         A    In the morning.  Probably about, I got up

7    early and had them come out early.  Probably, guessing,

8    10:30, 11:00 in the morning.

9         Q    And you were having symptoms that you

10   described to me in your back, your neck and your arms

11   and legs?

12        A    Yes, sir.

13        Q    Are those the symptoms that you reported at

14   the hospital?

15        A    Yes, sir.

16        Q    What did they do for you?

17        A    They couldn't do any kind of X-rays or CTs

18   because of the thought of me possibly being pregnant.

19   So the doctor just looked me over and gave me muscle

20   relaxers and some medication to see if it would help

21   with the pain.

22        Q    So he gave you muscle relaxers and some type

23   of pain medication?

24        A    Yeah.

25        Q    Did you take that?

```
 1        A    I believe I, they gave me one to take right
 2   there at the hospital.  The pain medication I took right
 3   there at the hospital.  I didn't take the muscle
 4   relaxers till I got home that night.
 5        Q    Did you have a prescription filled?
 6        A    Yes.  I believe it was at Walgreens is where I
 7   had my prescription filled.
 8        Q    What location?
 9        A    In Winter Garden, 535 and Tilden Road.
10        Q    Did you take all of the prescription
11   medication that was prescribed to you?
12        A    I never finished the pain medication all the
13   way because they switched, when I went to the
14   chiropractor and the other doctor, they switched my
15   medication to something different.  So they had me stop
16   the muscle relaxers and the pain medication and they put
17   me on something different.
18        Q    Other than giving you a prescription for pain
19   medication at the hospital, did they give you any other
20   instructions?
21        A    They told me to do ice and heat and see if
22   that would help, but not to do much lifting or do
23   anything, just to take it easy and lay down and relax
24   for a little, a couple of days.  So I had to take the
25   next day off of work.
```

1    Q     Did they refer you to any other doctors?

2    A     They told me if it continued to come back and

3  see them, and they told me that I could follow up with

4  my primary care physician.

5    Q     Did you follow those directions?

6    A     My primary care physician would not see me

7  because it was an automobile accident.

8    Q     Who is that?

9    A     Dr. Carr.

10    Q     What's his first name?

11    A     Deana.

12    Q     Is it C-A-R-R?

13    A     C-A-R-R.

14    Q     Where is she located?

15    A     Ocoee, off of Highway 50.

16    Q     And she declined to see you because it was an

17  auto accident?

18    A     Correct.

19    Q     So what did you do?

20    A     I ended up going to see my, the chiropractor

21  in Clermont.

22    Q     How did you get to him?

23    A     I was referred.

24    Q     How were you referred?

25          MR. HAYES:  Object to the form.  I'll instruct

1     you not to answer that.

2    BY MR. GOBEL:

3        Q     Did any friend refer you to the chiropractor?

4        A     I don't believe so.

5        Q     Did any acquaintance refer you to a

6    chiropractor?

7        A     I don't believe so.

8        Q     Okay.  When did you first contact an attorney

9    following this accident?

10       A     Probably three or four days following my, the

11   car accident.

12       Q     Did you talk to any attorney's office before

13   you contacted the attorney?

14       A     No.  I just contacted Mr. Hayes (indicating).

15       Q     Did you contact an attorney before you went to

16   the chiropractor?

17             MR. HAYES:  Object to the form.

18             THE WITNESS:  Oh, do you want me to answer

19         that?

20             MR. HAYES:  Yeah, you can go ahead and answer

21         that.

22             THE WITNESS:  Okay.  I don't, no, it was after

23         I spoke to the attorney, I believe.

24   BY MR. GOBEL:

25       Q     So you contacted the attorney before you went

| | |
|---|---|
| 1 | to the chiropractor, correct? |
| 2 |     A    Correct.  I believe so, yes. |
| 3 |        MR. GOBEL:  All right.  We've been going about |
| 4 | an hour. |
| 5 |        Does anybody want to take a quick break? |
| 6 |        THE WITNESS:  I'm okay right now.  I might |
| 7 | want to, yeah, can I walk for -- |
| 8 |        MR. GOBEL:  Sure. |
| 9 |        (A recess was taken from 10:36 a.m. until |
| 10 | 10:43 a.m.) |
| 11 | BY MR. GOBEL: |
| 12 |     Q    Okay.  So you went to the chiropractor.  What |
| 13 | was the name of this chiropractor? |
| 14 |     A    Dr. Brockman. |
| 15 |     Q    Does he also have a medical doctor at his |
| 16 | office? |
| 17 |     A    I'm unsure. |
| 18 |     Q    Did you ever see a medical doctor in his |
| 19 | office? |
| 20 |     A    I don't believe so. |
| 21 |     Q    Well, you said somebody there changed your |
| 22 | medication? |
| 23 |     A    Dr. Duke changed my medication. |
| 24 |     Q    Okay.  When you first went to Dr. Brockman, |
| 25 | what complaints did you report? |

1      A     The same complaints I reported at the

2   emergency room, the tingling, the back and the neck.

3      Q     And that's the tingling in your arms and your

4   legs?

5      A     Yes, sir.

6      Q     And what type of treatment did he provide for

7   you?

8      A     He did massage therapy, physical therapy and

9   he also did traction.

10      Q     Did any of the treatment he provided for you

11   provide any assistance?

12      A     The traction helped for a day or two, but then

13   it would come back.

14      Q     When you say traction, was it like a roller

15   table?

16      A     It's a machine that I lay in that comes around

17   my neck and pulls my spine to try to get the disks to

18   slide back into place.  And I was doing that three to

19   four times a week.

20      Q     Was that called a VAX-D table, do you know?

21      A     I think the VAX-D table is the one for the

22   lower back.  He didn't, he only did the traction for the

23   neck, it's, their traction table and was doing

24   adjustments as well.

25      Q     He did a, he did use the VAX-D table?

1        A    No.  He was doing just manual adjustments on

2    my neck and my lower back.

3        Q    Did he ever use the VAX-D table on your lower

4    back?

5        A    I don't believe so.

6        Q    But it was not the VAX-D table on your neck?

7        A    (Witness shakes head.)

8        Q    No?

9        A    No.  No.

10       Q    Okay.  And any of the treatment that

11   Dr. Brockman provided to you, did it ever provide you

12   anything more than temporary relief?

13            MR. HAYES:  Object to the form.

14            THE WITNESS:  Huh?

15            MR. HAYES:  You can go ahead and answer.

16            THE WITNESS:  The, I mean, the massage helped,

17       and they gave me a stability ball that I was using

18       for physical therapy for home, to do the home

19       exercises as well to help.  They were trying to

20       build up my muscles around my injury (indicating)

21       to kind of help with the pain and the traction, but

22       I would feel good after I left and then within a

23       day or two, I would have the same issue again and

24       would have to go back in.  And I was getting

25       headaches as well.

1    BY MR. GOBEL:

2        Q    Okay.  And what I was asking you is, did you

3    ever experience any type of lasting treatment from any

4    of the treatment provided -- let me restate the

5    question.

6             What I was trying to ask is, did you ever

7    receive any lasting pain relief or symptom relief from

8    any of the treatment provided by Dr. Brockman?

9        A    Not really.

10       Q    So anything that he did provided only

11   temporary relief?

12       A    Correct.

13       Q    Other than the traction, the massage and the

14   physical therapy and the chiropractic adjustments, did

15   he provide anything else --

16       A    No.

17       Q    -- any other type of treatment to you?

18       A    No.

19       Q    How long did you go to Dr. Brockman?

20       A    I probably was seeing Dr. Brockman for almost

21   over a year.

22       Q    You mentioned that you went to a Dr. Duke?

23       A    Yes.

24       Q    When did you first go to Dr. Duke?

25       A    Oh, I don't remember the exact date.  It was,

1   it was probably, I would say a couple of months

2   following first seeing Dr. Brockman.  I'm unsure of the

3   date.

4        Q    How did you hear about Dr. Duke?

5             MR. HAYES:  Object to the form.  I'll instruct

6        you not to answer that.

7   BY MR. GOBEL:

8        Q    Okay.  Let me ask the question a different

9   way.  Did anybody other than your attorneys tell about

10  Dr. Duke?

11       A    I can't remember.  I'm unsure.

12       Q    Let me ask the question a different way.  Do

13  you remember anybody else other than your attorneys

14  telling you about Dr. Duke?

15       A    I don't remember if anybody else told me about

16  Dr. Duke.

17       Q    What complaints did you relate to Dr. Duke the

18  first time that you went there?

19       A    The same issues I related the first, the time

20  at the emergency room and with Dr. Brockman.

21       Q    So you still had the neck pain?

22       A    And the back pain and the tingly.

23       Q    Okay.  I'm sure at some point during the

24  course of your treatment you have been asked to quantify

25  your pain on a scale of one to ten?

1        A      Correct.

2        Q      Okay.  One being little to no pain and ten

3   being the worst pain imaginable?

4        A      Correct.

5        Q      When you first went to Dr. Brockman, can you

6   tell me, on a scale of one to ten, what was your pain in

7   your neck?

8        A      I believe I told him it was a seven or an

9   eight, I believe.

10       Q      That's when you first went to see him?

11       A      Correct.  Because he did ask my first visit

12  how, what my scale was.

13       Q      What about your back?

14       A      I believe I told him the same, the same.

15       Q      What about your arms?

16       A      The arms, the tingling and stuff?  I believe I

17  told him it was about a five or a six.

18       Q      And what about your legs?

19       A      About the same as my arms.  I'm unsure, but I

20  believe that's --

21       Q      A five or six?

22       A      -- what I told him.  Yes.

23       Q      And I want you to understand I'm not asking

24  you, as you sit here today, what you told Dr. Brockman.

25  What I'm asking you, as you sit here today, is what is

```
 1    your recollection of what your pain was, what is your
 2    present recollection of what your pain was on that scale
 3    of one to ten when you first went to see --
 4         A    It was probably about a six with my arms and
 5    my legs.
 6         Q    Do you understand the question?
 7         A    Yes.
 8         Q    Okay.  What I'm asking is, what is your
 9    present recollection of your pain, on a scale of one to
10    ten, in the different areas that we are discussing?
11         A    Correct.
12         Q    And now that you understand the question,
13    would it have been a seven to eight in your neck?
14         A    Correct.
15         Q    Would it have been a seven to eight in your
16    back?
17         A    Correct.
18         Q    And a five to six in your neck, arms and legs?
19         A    Correct.
20         Q    And that would have been the first time you
21    went to see Brockman?
22         A    Correct.
23         Q    And then when you first went to see Duke, what
24    was it?
25         A    The same as when I saw Dr. Brockman.
```

1    Q    So your pain levels didn't change at all?

2    A    No.

3    Q    Okay.  And what did -- first of all, did you

4    ever see a doctor the first time you went to Dr. Duke's

5    office?

6    A    I know he has a doctor in his office.  I don't

7    remember if I saw him or not.

8    Q    So you don't recall whether or not you saw a

9    doctor the first visit?

10    A    I don't, I don't remember.

11    Q    Do you remember if it was a male or female

12    that you saw?

13    A    It was a male.

14    Q    Was it Dr. Duke, do you know?

15    A    I saw a gentleman before I saw Dr. Duke.  I

16    saw both of them that day.

17    Q    You did see Dr. Duke the first day?

18    A    Yes.

19    Q    What did he tell you?

20         MR. HAYES:  Object to the form.

21    BY MR. GOBEL:

22    Q    What did Dr. Duke tell you?

23    A    He just looked over my X-rays.

24    Q    So you did have X-rays?

25    A    I, I, Dr. Brockman sent me for X-rays.

1    Q    Did he do a pregnancy test first?

2    A    I got, I ended up getting my period.  That's

3    why they told me I could go for the X-rays.

4    Q    Okay.

5    A    And the CT scan, I believe as well, I brought

6    with me to see Dr. Duke.

7    Q    And the CT scan was of your head?

8    A    Of my neck area (indicating).  I think that's

9    what it was called.

10   Q    Did you get an MRI?

11   A    Yeah, I believe it was an MRI, is what I had.

12   Q    So it was an MRI, not a CT?

13   A    Yeah.  I'm sorry.  Yes.

14   Q    Okay.  What did Dr. Duke tell you upon

15   reviewing your films and diagnostic studies?

16        MR. HAYES:  Object to the form.

17        THE WITNESS:  I don't remember what he told

18      me.  I really have no idea.

19   BY MR. GOBEL:

20   Q    What did any person at Dr. Duke's office tell

21   you on that first visit?

22        MR. HAYES:  Object to the form.

23        THE WITNESS:  I, that I did have some, some

24      kind of issues, and I don't remember the exact

25      words he used, and I don't want to put words in the

 1          mouth, but that I had something, an issue in my

 2          lower back and in my neck.

 3     BY MR. GOBEL:

 4          Q    Did they give you any more specificity than

 5     that?

 6          A    I don't remember.  I don't remember exactly

 7     what he told me.

 8          Q    Okay.  Did he tell you what he was going to do

 9     for you?

10          A    He gave me a couple of options on what we can

11     do.

12          Q    What options were those?

13               MR. HAYES:  Object to the form.

14               THE WITNESS:  He said we can do shots, that I

15          can keep doing my physical therapy and my massage

16          therapy and the traction I can keep doing, or I can

17          also think about maybe doing a surgery to help fix

18          my problem.

19     BY MR. GOBEL:

20          Q    Okay.  What did he say to you about shots?

21               MR. HAYES:  Object to the form.

22     BY MR. GOBEL:

23          Q    First of all, was this Dr. Duke or was this

24     the other one?

25          A    Dr. Duke.

*First-Choice Reporting Services, Inc.*                                      49

1      Q      All right.  And what did Dr. Duke say to you

2    about shots?

3      A      That there's a shot that they can do to help

4    with the disks or, I don't remember the full details

5    with it, but I know my brother had the shots and he was

6    not a fan of the shots.  Not with Dr. Duke, but did

7    not...

8      Q      So what did you decide about the shots?

9      A      I did not want to do the shots.

10      Q      So you would rather have surgery than shots?

11      A      I actually didn't even want to do the surgery

12    to begin with.

13      Q      So at your first visit, you rejected both the

14    shots and the surgery?

15      A      Uh-huh.

16      Q      Yes?

17      A      Yes.

18      Q      What did you do following your first visit?

19      A      I just kept going to the chiropractor and

20    doing physical therapy and hoping that it would help;

21    and doing the pain medication and the muscle relaxers,

22    hoping that it would help.

23      Q      How long did you go to the chiropractor before

24    you went to Duke?

25      A      I believe before my -- my initial visit?  My

1    first initial visit?  I think it was a couple of months.

2         Q    Okay.  And at some point did you decide to go

3    back to Duke?

4         A    Yes.  I decided to get more information on the

5    surgery and because I did not want to be in pain

6    anymore.

7         Q    Okay.  Did you ever undergo any other

8    diagnostic tests other than the MRI study?

9         A    They did an electroshock test to check my

10   nerves where they would put the needles in my hands, in

11   my arms, in my head, in my feet and my legs.  I have

12   done that one.

13        Q    Where did you have that done?

14        A    At the, at a doctor's office that, in Winter

15   Park.  The same doctor's office Dr. Duke worked out of,

16   but it was a medical doctor.  His medical doctor did it.

17        Q    So you saw Dr. Duke in Orlando?

18        A    Yes.

19        Q    In Winter Park, is that what you said?

20        A    Yes.

21        Q    What office is that?

22        A    It, it, Howell Branch Road.

23        Q    What was the name of that office?

24        A    I don't remember.

25        Q    What was the name of the doctor that did the

1  electrodiagnostic testing?

2      A    I don't remember.

3      Q    Who recommended that needle test that you

4  described?

5      A    Dr. Duke suggested that I have that test.

6      Q    Did anybody ever tell you what the results of

7  that test were?

8      A    I believe the doctor called me and told me

9  that it, the results to that test.

10     Q    Which doctor called you?

11     A    Not Dr. -- the medical doctor that performed

12  the test.

13     Q    What did he tell you about the results of that

14  test?

15          MR. HAYES:  Object to the form.

16          THE WITNESS:  I don't remember if -- I have

17      had so many test results.  I don't remember.

18  BY MR. GOBEL:

19     Q    Did he tell you what the test was for?

20     A    To check for nerve damage.

21     Q    Did he tell you if the test revealed any nerve

22  damage?

23     A    I don't remember.  I don't, I don't remember.

24     Q    Did anybody ever tell you that the test was to

25  determine if a disk in your neck was causing you to have

```
 1    some type of arm symptoms?
 2              MR. HAYES:  Object to the form.
 3              THE WITNESS:  Possibly.  I don't remember.  I
 4         don't, I know it was to check the nerves.  Maybe
 5         the disk was pushing on the nerves causing me, my
 6         arms and my legs to have this issue.  I know that's
 7         one of the reasons we were doing that test, but I
 8         don't remember the results.  I don't remember what
 9         else went with it.
10    BY MR. GOBEL:
11         Q    Okay.  Did Dr. Duke ever talk to you about the
12    results of that test?
13         A    I don't remember.  He might have.  I know it
14    was one of the tests that needed to be done before I
15    did, thought about doing surgery.
16              MR. HAYES:  Off the record for a second?
17              MR. GOBEL:  Sure.
18              (A discussion was held off the record.)
19              MR. GOBEL:  Back on the record.
20    BY MR. GOBEL:
21         Q    So I was asking you about this needle test.
22    You said he had actually put needles in your hands and
23    arms and neck and head?
24         A    Uh-huh.
25         Q    Yes?
```

1      A     Yes.

2      Q     Okay.  And did anybody ever explain the

3   results of that test to you?

4      A     I don't remember.

5      Q     Okay.  After you had that test, what was your

6   next step?

7      A     I believe I made an appointment to go see

8   another medical doctor to get clearance for surgery.

9      Q     Who did you go to for that?

10     A     I don't, a doctor in Kissimmee, because my

11  primary care, they needed my primary care physician to

12  approve me for surgery, but my primary care physician

13  would not see me because of the accident.

14     Q     Who is that doctor in Kissimmee?

15     A     I'm trying to remember who referred me.  It, I

16  don't remember if Dr. Brockman referred me, because I

17  told him about how my doctor, my primary care won't see

18  me, if there's a doctor that I could see to get some, to

19  get my blood work cleared.  And I believe Dr. Brockman

20  referred me to the medical doctor.  I don't remember his

21  name.  I just...

22     Q     Okay.  Did you ever go to Parrish Hospital in

23  Brevard County?

24     A     I never went to a hospital in Brevard County.

25     Q     Did you ever go to a Parrish Medical Center in

1   Brevard County?

2          A     I don't remember.  A Parrish?  I don't

3   remember the name of...

4          Q     Did you ever go to, you never went to any

5   hospital in Brevard County though?

6          A     No.

7          Q     Okay.  Did you ever go to any office in

8   Brevard County other than Dr. Duke Magin's (ph) office?

9          A     No.

10         Q     The only office that you went to in Brevard

11  County was Dr. Duke Magin's office?

12         A     Correct.

13         Q     Okay.  So what surgery did Dr. -- I'm assuming

14  that Dr. Duke recommended that you have some type of

15  surgery?

16         A     Yes.  I had laser neck surgery.

17         Q     Did he tell you anything more specific about

18  it other than it was laser neck surgery?

19         A     He explained it to my husband.

20         Q     And did he perform that surgery?

21         A     Yes.

22         Q     And where did he do that?

23         A     In the Vero Beach office.

24         Q     Did you ever go to an office in Melbourne?

25         A     I think it's the same office.

```
 1        Q     Did you ever go to an office in Titusville?

 2        A     No.

 3        Q     Okay.  So the only places that you saw

 4   Dr. Duke Magin was either in the office in Howell Branch

 5   Road, or on Howell Branch Road in Orlando -- that's in

 6   Winter Park, right?

 7        A     Yeah.

 8        Q     Okay.  Or the office over in Vero Beach?

 9        A     And I only was there once for the surgery, was

10   the only time I went to the Vero Beach one.

11        Q     Tell me about -- first of all, when did you

12   have that surgery?

13        A     June of last year.

14        Q     And tell me about that surgery.  Tell me about

15   that day.

16        A     I had to, I remember not eating and drinking

17   and driving over there.  I, I believe my surgery was 12

18   or 1:00 in the afternoon.  I remember having them check

19   my blood pressure, do all that, putting the anesthesia

20   needle in (indicating).  And then I remember going to

21   the emergency room, the -- going to the room where the

22   surgery and falling asleep and waking up and my husband

23   was there.  And that's...

24        Q     Okay.  What time did you arrive at the office,

25   Dr. Duke Magin's office on that day?
```

1        A     I want to say, I'm unsure on the time, but if

2    I have to guess, I would probably say about 1:00

3    o'clock.

4        Q     What time did you leave?

5        A     Probably not till 4 or 5:00 o'clock.

6        Q     And did you go home following the procedure?

7        A     I stopped at my mom's on the way home.

8        Q     Why did you do that?

9        A     Because my parents wanted to make sure and

10   check on me before I went home.

11       Q     Okay.  Did you get out of the car there?

12       A     Yes.  I went into the house and then we got

13   back in the car and left.  I was only at my parents'

14   probably for about 30 minutes.

15       Q     And then you went home?

16       A     Yes.

17       Q     So you remember the ride home?

18       A     I do remember the ride home.

19       Q     Were you in any type of discomfort?

20       A     No.

21       Q     Did you have any stitches in your back?

22       A     It was in my front (indicating), my neck,

23   huh-uh.

24       Q     You had a Band Aid?

25       A     It looked kind of like a butterfly.

1        Q     It's called a Steri Strip?

2        A     Yeah.   That was over it and then they put a

3    piece of gauze with the tape over it as well.   So I

4    didn't even see the wound till three days, four days

5    later.

6        Q     Okay.   You are saying it's right in the front

7    of your neck?

8        A     Yeah.   Like right in here is my scar

9    (indicating).

10       Q     I don't see anything.   Do you see a visible

11   scar?   Is there something there that's visible to you?

12       A     I do when I look in the mirror.   I know

13   exactly where the scar is, and you can feel exactly

14   where the scar is.

15       Q     Okay.   Do you think, should I be able to see

16   it from sitting across the table from you right now?

17       A     Some people see it, some people don't.   So it,

18   I, I am using like the stuff to help get rid of the scar

19   because it is my neck area.

20       Q     Okay.   All right.   Are you alleging, I guess

21   you're telling me that you are alleging that you have a

22   scar on your neck?

23       A     I do have a scar on my neck, yeah.

24       Q     Okay.   And you believe that the scar is

25   visible?

*First-Choice Reporting Services, Inc.*                          **58**

1      A    Oh, yeah.

2      Q    Do you have any makeup on it today?

3      A    I do have makeup on it today, but, yeah.

4      Q    Do you usually have makeup on it?

5      A    Yes.  I try to cover it up.

6      Q    Okay.  So you remember the ride home.  You

7   didn't have any discomfort on the ride home.

8           What did you do after you stopped at your

9   parents' and went home?

10     A    I went home.  We got back in the car and went

11  home.

12     Q    And what did you do that day?

13     A    Laid on the couch, watched movies and colored

14  in a coloring book.

15     Q    Okay.  I mean, I have got to ask.  Okay.  Why

16  are you coloring?

17     A    I needed something.  I was, I needed to be out

18  of work for three days and watching T.V. gets boring and

19  I don't want to be walking around the house.  So my

20  husband bought me coloring books to kind of keep busy

21  and puzzles.

22     Q    Okay.  So you stayed home from work for three

23  days?

24     A    Correct.

25     Q    Did you return to work after that?

1        A     Correct.

2        Q     What's your job at Wyndham?

3        A     I'm in marketing.

4        Q     Are you alleging that you missed any other

5    work, any other work other than the, I think it was one

6    day after the accident and then the three days from the

7    surgery?

8        A     And I believe I missed, well, the surgery and

9    then the couple of days after the surgery is what I

10   missed from work from the accident.

11       Q     So you missed one day after the accident,

12   correct?

13       A     Correct.

14       Q     And then three days after the surgery?

15       A     Correct.

16       Q     Any other work that you're alleging that you

17   missed?

18       A     I don't remember.  I remember I have left

19   early because of the headaches that I had from the

20   accident, but I didn't miss work because of those.

21       Q     How many times did you leave early?

22       A     Possibly three, maybe four.

23       Q     Are you alleging that you lost income because

24   of that?

25       A     Oh, I know I have.  I'm, I just had the

1    headaches really bad, so I didn't want to stay.

2         Q    No, I'm sorry.  I'm not asking you are you

3    alleging that you had headaches.  I'm asking you, are

4    you alleging that you lost income?  Did you lose money

5    because --

6         A    Oh.  Yeah.

7         Q    -- you left the office early?

8         A    Yeah.  Yes.

9         Q    Do you get paid on an hourly basis?

10        A    An hourly plus commission basis.

11        Q    So you lost money from the hourly rate?

12        A    And commission, the people I would have done

13   check-ins.

14        Q    Do you know how much?

15        A    I don't.

16        Q    Did you ever have pain in either of your

17   hands?

18        A    I believe I did have the pain in the hands

19   when I was having the tingling.  My, it would go into my

20   palms as well.

21        Q    So you had pain in the palms of your hand?

22        A    Well, yeah.  When I said my arms, I meant like

23   even my hands.

24        Q    Okay.  The question I have got for you is, did

25   you have pain?  Not numbness, did you have pain in the

```
 1    palms of your hands?

 2         A    Yeah, a little bit, like pins and needle kind

 3    of a pain.

 4         Q    Did you have numbness in your hands?

 5         A    (Witness nods head.)

 6         Q    Yes?

 7         A    Yes.

 8         Q    Both hands?

 9         A    Both.  More of one side than another.

10         Q    Which side more?

11         A    I believe it was my left side I had the most

12    pain in, but I'm unsure.  I can't remember which one.  I

13    believe it was my left, but I'm...

14         Q    Okay.  Did the procedure that Dr. Duke

15    performed provide any relief?

16         A    Yes.

17         Q    Tell me about the relief.

18         A    I actually can move my head now in a circle.

19    I'm not stuck with, my range of motion is more.  I

20    haven't had any pain in my hands, in my arms.  They

21    haven't been doing the numb, tingly; same thing with my

22    legs.  And I no longer have the bad headaches.

23         Q    So you don't have any pain in your legs

24    anymore?

25         A    Huh-uh.
```

1    Q    No?

2    A    No.

3    Q    Let me ask the question -- part of the problem

4  is we need to make sure that we are providing a clear

5  record, that I'm speaking and completing my sentence

6  before you start your answer.  That way she can take

7  down what we both say.

8    A    Okay.

9    Q    All right.  Do you understand that?

10    A    Yes.

11    Q    Okay.  All right.  I'm not trying to cut you

12  off or be rude, I just want to make sure that we get a

13  clear record.

14    A    Sure.

15    Q    Okay.  What I'm asking you is, do you have any

16  pain in your legs following the procedure that Dr. Duke

17  performed?

18    A    No.

19    Q    And that was just a cervical procedure,

20  correct?

21    A    My neck procedure.  I believe there were two

22  disks he did in my neck.

23    Q    Okay.  What other relief did the procedure

24  provide?

25    A    Well, the headaches was a big one as well.

1        Q    So the headaches are gone?

2        A    My headaches are gone.

3        Q    The neck pain is gone?

4        A    My neck pain is gone.

5        Q    The arm pain is gone?

6        A    The arm pain is gone.

7        Q    And the leg --

8        A    And I'm not --

9        Q    -- pain is gone?

10       A    Yeah.  I'm not nearly as stiff or, in my neck

11   anymore.

12       Q    Okay.  Do you have any other visits scheduled

13   with Dr. Duke?

14       A    No.

15       Q    Do you have any other visits scheduled with

16   any other medical provider for your neck or back

17   problems?

18       A    I'm only seeing Dr. Brockman on as-needed

19   basis.

20       Q    When is the last time you saw Brockman?

21       A    It's been a couple of months.

22       Q    So you don't have any currently scheduled

23   visits?

24       A    Correct.

25       Q    Let's talk about the pain scale again.  I

1    guess you're telling me that your pain in your neck is

2    gone, so that be a zero, correct?

3         A    Correct.

4         Q    The pain in your arms is gone, so that would

5    be a zero?

6         A    Correct.

7         Q    The pain in your legs is gone, so that would

8    be a zero?

9         A    Correct.

10        Q    And do you have any residual complaints in

11   your lower back?

12        A    Yes.  My lower back is, I still have pain in

13   my lower back.

14        Q    And what would you rate that on a scale of one

15   to ten?

16        A    It depends on the day, but on a bad day,

17   probably a good eight or nine.

18        Q    Okay.

19        A    And then on a good day, probably a three or a

20   four.

21        Q    So is today a good day or a bad day?

22        A    Right now it's in the middle.  I just have to

23   keep switching sides.

24        Q    And how would you rate your pain today in your

25   lower back?

1    A    It's probably a five today.

2    Q    Are you on any type of medication?

3    A    No.

4    Q    Does your back pain ever keep you from doing

5  anything you otherwise would do?

6    A    I haven't, I'm unsure, because I really have

7  not sat down and looked at what I used to do to what I

8  do.  I just kind of adjusted to what I can do now.  So I

9  don't, I haven't really compared what I used to do to

10  what I have done, what I do now.

11    Q    Okay.  Do you have health insurance through

12  Wyndham?

13    A    Yes.

14    Q    And you were working at Wyndham at the time

15  you had the procedure with Dr. Duke?

16    A    Correct.

17    Q    Who is your health insurance with?

18    A    I'm trying to think.  Oh, my God, what is it?

19  United Health Care?  Cigna.  Sorry.  Cigna.  Cigna.  I'm

20  trying to remember.

21    Q    Okay.  When you went to Dr. Duke's office the

22  first time, did you talk to anyone about using your

23  health insurance there?

24    A    No, I didn't, but I didn't think that I could

25  because it was a car accident, because Dr. Carr told me

*First-Choice Reporting Services, Inc.*                    66

```
 1    that she was not able to take my health insurance
 2    because it was a car, car accident.  So she's unable to
 3    take my health insurance to see me regarding my
 4    incident.
 5         Q    That's what Dr. Carr told you?
 6         A    Correct.  And I just assumed that that is
 7    what, the same thing with Dr. Duke.  I didn't really go
 8    into it.  They did photocopy my insurance, because at
 9    that time I had two separate insurances.
10         Q    What other insurance did you have?
11         A    I had United Health Care, which was through my
12    husband.
13         Q    So you had health insurance available through
14    United or through Cigna?
15         A    Correct.
16         Q    And United was through Tricare; is that right?
17         A    I don't believe, I don't remember.
18         Q    No.  Your husband was working with Southland.
19         A    Southland, yeah.
20         Q    So it wasn't Tricare anymore, correct?
21         A    I never had Tricare.
22         Q    You were married to your husband while he was
23    in the military, right?
24         A    Yeah.
25         Q    But you never --
```

1     A     I didn't, I didn't have his --

2     Q     You were never a beneficiary?

3     A     Huh-uh.  No.  I didn't have any of his health

4   insurance benefits.

5     Q     Okay.  Did anybody at Duke Spine -- you signed

6   a lot of documents at Duke Spine when you first went

7   there the first time, right?

8     A     Yeah, I believe I did.

9     Q     Did anybody at Duke Spine explain that you

10  were waiving off on the right to use your health

11  insurance benefits there?

12          MR. HAYES:  Object to the form.

13          THE WITNESS:  I don't remember.  I don't.  I

14       signed so many papers because of my accident.  I

15       don't remember.

16  BY MR. GOBEL:

17     Q     Did anybody explain that to you?

18          MR. HAYES:  Object to the form.

19          THE WITNESS:  I'm, I'm unsure.  They could

20       have.  I don't remember.

21  BY MR. GOBEL:

22     Q     Okay.  Did anybody there ever talk to you

23  about the cost of any procedures that you were

24  undergoing?

25          MR. HAYES:  Object to the form.

1          THE WITNESS:  Not, I don't remember, but if

2      they talked to me about the surgery, I don't think

3      I really paid attention because of, I just wanted

4      my pain to go away.

5   BY MR. GOBEL:

6      Q    And I understand that.  I'm trying to ask you

7   some specific questions.

8          Did anybody there ever ask you or talk to you

9   about the cost of the procedure?

10     A    I'm sure they --

11         MR. HAYES:  Object to the form.

12         THE WITNESS:  I'm sure they did.  I just, I

13     don't remember.  I don't remember.

14  BY MR. GOBEL:

15     Q    Did anybody there ever explain to you that you

16  were giving Duke Spine a lien on the proceeds of this

17  lawsuit?

18         MR. HAYES:  Object to the form.

19         THE WITNESS:  I don't, I don't remember.

20  BY MR. GOBEL:

21     Q    In other words, did they explain to you that

22  they would get paid from however this lawsuit turned

23  out?

24         MR. HAYES:  Same objection.

25         THE WITNESS:  I don't remember.  I really

1            honestly do not remember.

2    BY MR. GOBEL:

3        Q    Well, let me ask you this.  Why would you give

4    up your health insurance benefits?  Why would you

5    relinquish the right to have your health insurance

6    coverage pay for any procedures that you would have

7    performed?

8              MR. HAYES:  Object to the form.

9              THE WITNESS:  I didn't, I don't remember any

10        of it.

11   BY MR. GOBEL:

12       Q    I'm not asking you whether you remembered it,

13   I'm asking why would you give up that right for your

14   health insurance --

15       A    I never knew if I did or I did not.

16       Q    Okay.  I'm asking you a different question.

17   I'm not asking you whether you did or didn't.  Do you

18   understand?

19       A    Okay.

20       Q    Okay.  What I'm asking you is, can you give me

21   any reason why you would give up your health insurance,

22   the right to have your health insurance cover a

23   procedure?

24             MR. HAYES:  Object to the form.

25             THE WITNESS:  I wouldn't.

1    BY MR. GOBEL:

2        Q    Have you ever received a bill from Duke Spine?

3        A    I have not seen a bill.

4        Q    And to your knowledge, nobody has ever told

5    you the cost of any procedures there?

6             MR. HAYES:  Object to the form.

7             THE WITNESS:  I don't remember.

8    BY MR. GOBEL:

9        Q    Did you know that Duke Spine has a bill for

10   the procedures that they performed for $63,000?

11       A    Okay.  I don't, I guess so.  I don't...

12       Q    Okay.

13       A    I didn't know.

14       Q    If I were to tell you that more than $50,000

15   of that charge was for the four hours that you were

16   there at his office, would you say that, would you

17   believe that that's a reasonable charge?

18             MR. HAYES:  Object to the form.

19             THE WITNESS:  I can tell you the surgery was

20        unbelievable.  It's helped me out.  So, to me, it's

21        definitely worth the money, for me.  I have

22        referred my friend to doing that.

23   BY MR. GOBEL:

24       Q    Who did you refer there?

25       A    Well, not, they are up in Chicago, but I told

1   them if he needs back surgery, he needs to do this.

2        Q    Okay.   What's the person's name in Chicago?

3        A    Chris Thompson.

4        Q    Let me ask you, if you were aware that your

5   health insurance would cover this and would reimburse

6   this at the rate of about $5,000, what would that mean

7   to you?

8             MR. HAYES:   Object to the form.

9             THE WITNESS:   I just, I mean, I, I don't, I

10       don't know.

11  BY MR. GOBEL:

12       Q    You would agree that your health insurance,

13  your health insurance contracts with the providers that

14  you go to, correct?

15       A    Uh-huh.

16            MR. HAYES:   Object to the form.

17  BY MR. GOBEL:

18       Q    Yes?

19       A    Correct.

20       Q    Okay.   And they negotiate the rates with your

21  health providers for your benefit, right?

22       A    Correct.

23       Q    And if they were to pay 5 to $6,000 for that

24  procedure, would you agree that that should be a rate

25  that would be reasonable?

```
1              MR. HAYES:  Object to the form.
2              THE WITNESS:  I, I, I, honestly, I do not
3         know.
4    BY MR. GOBEL:
5         Q    You agree that you had the right under your
6    health insurance plan for your health insurance to cover
7    this surgery, right?
8              MR. HAYES:  Object to the form.
9              THE WITNESS:  I was unsure.  Really, I had no
10             idea.  Obviously, my stay -- my primary care
11             physician couldn't see me because of the car
12             accident, so I didn't, I just automatically figured
13             that probably it won't be covered under my health
14             insurance.  And if it is, they have the copy of my
15             health insurance.
16   BY MR. GOBEL:
17        Q    In this lawsuit, do you think that State Farm
18   should be responsible for bills that are more than the
19   reasonable value of the bills?
20             MR. HAYES:  Object to the form.
21             THE WITNESS:  I'm, I don't know.
22   BY MR. GOBEL:
23        Q    I mean, it's just a simple question.  Do you
24   think State Farm should be responsible for the
25   reasonable value of the bills?
```

1              MR. HAYES:  Object to the form.

2              THE WITNESS:  Well, I mean, I really, I, State

3         Farm has hurt me, so I really don't know.

4    BY MR. GOBEL:

5         Q    Okay.  I'm asking you a different question

6    right now.

7         A    Yeah.  I'm just letting you know that I don't

8    know.  I don't know what State Farm should pay.  I don't

9    know.

10        Q    Okay.  Well, I'm just asking, this is a simple

11   question, do you think State Farm should be responsible

12   for more than the reasonable value of the bills?

13        A    Well, depending on what the reasonable, the

14   bill is considered reasonable.  I mean, to me,

15   Dr. Duke's bill is considered reasonable.  So I feel

16   that State Farm should pay because, to me, that's

17   considered reasonable.

18        Q    Well, I'm asking you just a general question.

19   Do you think that State Farm should be responsible for

20   more than the reasonable value of a bill?

21             MR. HAYES:  Object to the form.

22             THE WITNESS:  Well, and what I'm saying is it

23        depends.  Two different people could think that

24        reasonable is two completely different things.  You

25        may think one thing is reasonable, and I may think

1    another thing is reasonable.  State Farm may think

2    that Dr. Duke's bill is not reasonable, but, to me,

3    Dr. Duke's bill could be reasonable.  So, yes, if I

4    feel that Dr. Duke's bill is reasonable, then I

5    believe that State Farm should be paying that.

6    BY MR. GOBEL:

7        Q    Do you think you should be responsible for the

8    $63,000 bill to Dr. Duke?

9        A    I, I did not have anything, the accident was

10   not my fault.

11       Q    I'm asking you a completely different

12   question, okay?  I'm asking you about your

13   responsibility.  You're the one that went to Dr. Duke.

14   You're the one that underwent the procedure.  Do you

15   think you ought to be responsible for that $63,000 bill?

16            MR. HAYES:  Object to the form.

17            THE WITNESS:  I, I don't think I should be

18       responsible for --

19   BY MR. GOBEL:

20       Q    Why not?

21       A    Because this is why we have insurance.

22       Q    Okay.  Well --

23       A    This is why --

24       Q    -- let me ask you --

25       A    -- I pay insurance.

1       Q     -- this.  If this was not an automobile

2  accident and you went to Dr. Duke, do you think you

3  should be responsible for a $63,000 bill for that

4  procedure?

5           MR. HAYES:  Object to the form.

6           THE WITNESS:  But this is why I have

7       insurance.  I'm sure my, if my health insurance or

8       something, that's why we have insurance is for

9       issues like this.

10  BY MR. GOBEL:

11      Q     Okay.  So you think your health insurance

12  should cover it if it was not an automobile accident?

13      A     Correct.

14      Q     At whatever the rate that the health insurance

15  would pay?

16           MR. HAYES:  Object to the form.

17           THE WITNESS:  I don't know the rate, so I just

18       feel that somebody would be, should be responsible,

19       whether it be insurance, my car insurance or my

20       health insurance, somebody.

21  BY MR. GOBEL:

22      Q     I want you to assume that you don't have

23  health insurance and this is not, you went there not as

24  the result of an automobile accident.  Do you think you

25  should have to pay $63,000 for that procedure?

1        MR. HAYES:  Object to the form.

2        THE WITNESS:  I probably would not argue it.

3    I probably would pay it.

4   BY MR. GOBEL:

5        Q    Even if you knew that your health insurance or

6   a health insurer would pay $6,000 for the same

7   procedure?

8        MR. HAYES:  Object to the form.

9        THE WITNESS:  I would still, it's a bill.  I

10       mean, I can go, I went to the emergency room and

11       saw the emergency doctor.  And all the emergency

12       doctor is, Hi, how are you?  And turned around and

13       walked out, and I got a $5,000 bill from them.

14   BY MR. GOBEL:

15       Q    Let me ask you a different question.  Do you

16   think that the same procedure should be charged at

17   different rates depending on whether it's an auto

18   accident or not an auto accident?

19       MR. HAYES:  Object to the form.

20       THE WITNESS:  I'm unsure.  I don't, I don't

21       know.

22   BY MR. GOBEL:

23       Q    Does it seem reasonable to you that if it's

24   not an automobile accident, the procedure is $6,000 and

25   if it is an auto accident, it's $60,000?

```
 1            MR. HAYES:  Object to the form.
 2   BY MR. GOBEL:
 3       Q    Does that seem reasonable to you?
 4            MR. HAYES:  Same objection.
 5            THE WITNESS:  I don't, I don't know what, I
 6       don't know.
 7   BY MR. GOBEL:
 8       Q    You just don't have an opinion on that?
 9       A    I don't have an opinion.
10       Q    And just listening to that question, you can't
11   tell me if you think that's reasonable or not?
12            MR. HAYES:  Object to the form.
13   BY MR. GOBEL:
14       Q    I think what you're telling me is if you went
15   there and it was not an auto accident, you think it
16   would be reasonable for them to accept $6,000 from your
17   health insurance, right?
18            MR. HAYES:  Object to the form.
19            THE WITNESS:  Well, I mean, I don't, I would
20       not see what the insurance company, if I went
21       there, I would be like, How much would it cost?
22       Everybody would be like, Well, how much does it
23       cost, I'm sure.  I mean --
24   BY MR. GOBEL:
25       Q    And you think it would be reasonable for them
```

```
 1    to take what your health insurance paid at that point,
 2    right?
 3              MR. HAYES:  Object to the form.
 4              THE WITNESS:  So the surgery, so my health
 5          insurance would only pay $6,000 and that's it?  Is
 6          that what you are saying?
 7    BY MR. GOBEL:
 8       Q    I'm asking you, do you think that it would be
 9    reasonable for the provider, Dr. Duke, to accept what
10    the health insurance paid if your health insurance
11    provided coverage for that?
12              MR. HAYES:  Object to the form.
13              THE WITNESS:  It's, it's not my call.  I
14          really can't make an opinion on it.
15    BY MR. GOBEL:
16       Q    You said State Farm has hurt you somehow.  How
17    has State Farm hurt you?
18       A    Because, I mean, I have been a client with
19    them for, since I was 16.  They fixed my car.  My car
20    had $15,000 worth of damage.  They didn't total it.
21    They put me, my husband, my niece back in that car.  I
22    had to hire, I called them, had two separate, had them
23    send two separate adjustors out to look at that car.
24    Oh, no, it's fine, Ms. Crable.  Nothing is wrong with
25    it.  I'd put my family in that.  Fantastic.
```

1          I called a private adjuster to come out, one

2     that's not associated with State Farm.  Ms. Crable,

3     guess what, your car still needs $9,000 more worth of

4     work to even be close.  If you got in an accident today,

5     the same spot, your car would crumble.  That's not fair.

6          Q     Okay.  So you, other than, do you have any

7     other complaints other than the way that State Farm

8     handled the property damage?

9          A     I mean, I just, they wouldn't even listen to

10    me.  I called them.  Oh, no, that's the way it is.

11    Really, that's the way it is?  Yeah.  There's nothing.

12    But then as soon as I got an attorney involved, oh, the

13    car is totaled, like that (snapping fingers).

14         Q     So they've now paid you the total value of the

15    car?

16         A     Well, they didn't pay me.  They had to pay off

17    my car because I had a payment, but only after being put

18    in the car for six, seven months, fighting with them

19    over it.

20         Q     Okay.

21         A     Taking it back to the dealership.

22         Q     You said that State Farm hurt you.  Other than

23    being upset about the way that State Farm dealt with the

24    property damage to your car, are you alleging that State

25    Farm hurt you some other way?

1      A      No.  That's emotional.  I mean, that's hard.

2      Q      Okay.  Any other way than the property damage

3  aspect?

4      A      Not, I mean, just the way they treated me.

5      Q      Okay.  With respect to the property damage

6  claim?

7      A      With respect to even calling for my claim.  I

8  have never filed a claim with them before and the first

9  time I need my insurance company, no.

10     Q      Okay.  Any other complaints?

11     A      No.

12     Q      Before you had health insurance with Wyndham,

13  did you have health insurance through the animal

14  hospital?

15     A      Yes.

16     Q      And who was that?

17     A      I don't, I don't remember who they had.  I

18  don't remember.  I know I had to pay it on my own.

19     Q      And then did you also have health insurance

20  through Ace?

21     A      Yes.

22     Q      So you're expecting -- I see that South Lake

23  Wellness billed approximately $8,000 in this case?

24     A      Okay.

25     Q      You're expecting State Farm to pay for that,

1   correct?

2        A    I'm, I don't, I don't know.

3        Q    Are you seeking to recover that in this

4   action, that $8,000?

5        A    I don't know what I'm -- I don't, I just know

6   what the bills have come out to.  I don't --

7        Q    Let me ask you this.  Are you seeking to

8   recover the cost of all the medical bills --

9        A    Yes.

10       Q    -- that you incurred following this accident?

11       A    Correct.

12       Q    That would include the bills from South Lake

13   Wellness?

14       A    Correct.

15       Q    That would include the bills from Duke?

16       A    Correct.

17       Q    That would include the bills from Mid-Florida

18   Imaging?

19       A    Correct.

20       Q    That would include the bills from, I see

21   Orlando Health here.  Do you know who that is?  Is that

22   where you had, where you saw Dr. Duke?

23       A    Orlando Health?  Maybe that was the emergency

24   room?  Orlando Regional, I don't --

25       Q    So that would include the bills then from

1  South Lake Hospital?

2      A    Yes.

3      Q    That would include the bills from the

4  emergency physicians at South Lake Hospital?

5      A    Correct.

6      Q    Okay.  And are you seeking, you're also

7  seeking some lost wages?

8      A    I think I, I'm unsure, but I believe I am.  I

9  don't remember.

10      Q    And I think you told me you missed about five

11  days of work?

12      A    Well, I can definitely, I mean, I can prove to

13  you that I missed four, but, I mean, the headaches, I

14  did leave early.  I didn't miss like a full day.  I did

15  leave about 1:00 o'clock.

16      Q    Okay.  How much in lost wages do you estimate

17  that you have incurred?

18      A    I'm unsure because it's a commission and an

19  hourly basis.  I'm really unsure.

20      Q    Well, how much do you make per hour?

21      A    I think it's 8.25.  I think it just went up.

22      Q    Okay.  And what do you typically make in a day

23  for commissions?

24      A    It all depends on how many people I see.

25      Q    Well, I'm asking you about an average day.

1    A    I could tell you it's like $30, I make $37 a

2    person that I see.

3    Q    And how many people do you typically see in a

4    day?

5    A    Well, if it's not a weekend, probably three or

6    four; but if it's a weekend, I can tell you this Sunday

7    I saw 30-something people in one day.

8    Q    So you made $900 in one day?

9    A    On Sunday.

10    Q    Okay.  Did you miss any weekend days as a

11    result of this accident?

12    A    I know I missed Thursday, Friday and Saturday.

13    Q    So one weekend day, which could be --

14    A    And I think I went back to work Sunday or

15    Monday.  One of those two I went back to work.

16    Q    So one weekend day that could be $1,000 lost?

17    A    Correct.

18    Q    And then the week days, that's another, I

19    think you're telling me --

20    A    I can make --

21    Q    -- $200 --

22    A    -- about $1,500 a week.

23    Q    $1,500 a week?  So if you lost five days of

24    work, you're telling me that you've probably lost about

25    $1,500 in lost wages?

1    A    Could be.

2    Q    Does that seem accurate to you?

3    A    I mean, it all depends on how many people.  I

4   can't guess, put a guess on how many people I would see.

5   I can't put a guess on it.

6    Q    I understand that, but you're telling me in a

7   typical week you make about $1500?

8    A    Correct.

9    Q    If you lost five days of work, you're telling

10   me that's probably about $1,500 in lost wages?

11    A    Possibly could be, yes.

12    Q    Okay.  And I understand that you are also

13   claiming -- let me ask you this.  Are you also claiming

14   that, in this accident you have alleged in the

15   complaint -- have you read the complaint that was filed

16   in this case?

17    A    Possibly.  I don't, a lot of papers.

18    Q    All right.  Well, one of the things that you

19   are claiming is what people refer to as pain and

20   suffering damages, right?

21    A    Okay.

22    Q    You understand that that's one of the elements

23   of damages that you're seeking in this case, correct?

24    A    Okay.  Yes.

25    Q    Do you understand that?

1        A     Yes, I understand that.

2        Q     Okay.  And what I wanted to ask you is, what

3    do you think that a reasonable value for your pain and

4    suffering damages would be to this point?

5              MR. HAYES:  Object to the form.

6              THE WITNESS:  Honestly, I don't know.  I mean,

7    I, I can't put a number on how I feel.

8    BY MR. GOBEL:

9        Q     Okay.  And I understand that, and this is one

10   of the more difficult parts of a lawsuit is talking

11   about, quote, unquote, pain and suffering damages,

12   because, you know, there's case law that talks about how

13   it's dealt with and the juries are instructed by the

14   judge on how it's dealt with, but what it boils down to

15   is what do you think it's worth.  And that's what the

16   jury is going to want to know and that's what I need to

17   ask you here today.  And so when I'm asking you what you

18   think your pain and suffering damages are worth to this

19   point, I know it's hard to say, Well, it's worth X

20   dollars, but that's the only way that the jury can

21   quantify it.

22              So I need to ask you today, based upon where

23   you are today and what you have alleged that you have

24   been through over the past year or, yeah, over the past

25   year and a half, can you give me any type of range of

1   numbers that you would put on it?  If it's $5,000, if

2   it's $10,000, if it's between 50 and $100,000, whatever

3   you think -- and you can give me a range on whatever it

4   is.  I'm not trying to lock you in to $2,221.18.  I just

5   want to ask you, based upon where you have been and

6   where you are today, can you give me a range of value on

7   that, quote, unquote, pain and suffering damages?

8               MR. HAYES:  Same objection.

9               THE WITNESS:  I --

10  BY MR. GOBEL:

11      Q     First of all, do you understand the question?

12      A     I understand your question.

13      Q     Okay.

14      A     And I can't, I mean, I'm, I'm really unable to

15  put a dollar amount on it.  It's, it's hard to me, I

16  know I'm not locked into a number, but to even give you

17  a number, I wouldn't even know where to put a number.

18  So unfortunately I can't.  I mean, if it's left up to a

19  jury, then you know what?  It's left up to a jury.  I

20  can't, I can't put a number on it.

21      Q     Do you think it would be reasonable for a jury

22  to award you more than $10,000 for the pain and

23  suffering?

24              MR. HAYES:  Object to the form.

25              THE WITNESS:  Whatever they, I mean, whatever

1        they feel, I have to go with it, but I, I can't put
2        a number on it.
3   BY MR. GOBEL:
4        Q    Okay.  And I'm not asking you to put a number
5   on it, I'm asking you a different question.  If the jury
6   were to award more than $10,000, would you believe that
7   that would be reasonable?
8             MR. HAYES:  Object to the form.
9             THE WITNESS:  I don't, I really don't know.  I
10       don't know.
11  BY MR. GOBEL:
12       Q    Okay.  I started to ask you this before.  Do
13  you think that there's anything today that you can't do
14  because of the automobile accident?
15       A    I, I don't think that there's anything I can't
16  necessarily do.  Doing it with probably a little more
17  discomfort?  Possibly, but I don't think there's
18  anything I can't do.
19       Q    Okay.  What things that you do causes you some
20  discomfort at this point?
21       A    Well, I can, I mean, you know, sitting, you
22  see me.  I'm bouncing back and forth, but it's, I mean,
23  I do have, when I sit down or I'm on my feet for a long
24  period of time, you know, doing work around the house, I
25  mean, I get in pain.  Certain activities I do get pain

1   from.

2        Q    Okay.  Other than sitting for long periods of

3   time, standing for long periods of time or doing work

4   around the house, anything else that you can tell me

5   that causes you some discomfort?

6        A    I don't, it's one of those where it's, I have

7   to see how I am when I'm doing that certain activity.  I

8   can't, I don't know.  I can tell you though, for sure,

9   those three things definitely cause me pain in my back.

10       Q    And you can't think of anything else, as we

11  sit here today?

12       A    Not anything else.  I try to avoid carrying

13  things, like big things.

14       Q    Have you ever been charged with a crime?

15       A    Charged with a crime?  No.

16       Q    Do you have a gym membership anywhere?

17       A    No.

18       Q    Have you ever had a gym membership?

19       A    We went to, we used to go to the Y for like

20  two months, but that's it.

21       Q    When that was?

22       A    Oh, when me and my husband first got married.

23  So maybe four or five years ago.

24            MR. GOBEL:  Are you -- can we go off the

25       record?

| 1 | (A discussion was held off the record.) |
|---|---|

1     (A discussion was held off the record.)

2   BY MR. GOBEL:

3       Q    All right.  I understand that you are not

4   making a claim that your physical relationship with your

5   husband has been impacted by this accident; is that

6   correct?

7       A    Correct.

8       Q    Okay.  Are you currently pregnant?

9       A    Yes.

10      Q    Okay.  And are you alleging that there's any

11  problems with your pregnancy associated with this

12  accident?

13      A    Well, I mean, I'm, not necessarily like

14  problems with the baby, it is just I am having, and the

15  doctor is aware, I have more back pain due to the

16  pregnancy.  I also have a note that says I can't, I have

17  to be in flip-flops because of the back pain.  I have to

18  sit every, take a 15-minute break every two hours

19  because I'm on my feet a lot at work.  So I don't, and I

20  don't, I don't know how the epidural is going to work

21  with the issues in my back.  I don't.  So, I mean, right

22  now this is what I have (indicating).

23      Q    Okay.  How many weeks pregnant are you?

24      A    I'm actually 25 weeks.

25      Q    Congratulations.

1        A     Thanks.

2        Q     Boy or a girl?

3        A     Don't know.  Find out tomorrow.

4        Q     Yeah?

5        A     Yeah.

6        Q     All right.  I'm sure the doctor told you that

7    it's not unusual for any woman to have back pain --

8        A     Absolutely.  Yeah, I'm fully aware of that,

9    the back pain, definitely knew I was going to have back

10   pain, but it could be, what they said is it could be

11   heightened due to my disk issue in my back because of

12   the uterus pulling to the front and the gravity and the

13   change of motion with the baby, it could elevate my back

14   pain.

15       Q     Okay.  It also could be the same back pain

16   that every other woman experiences when she's pregnant

17   too, right?

18       A     I'm sure -- I'm unsure.  They just gave me

19   every reasonable scenario that could happen.

20       Q     And one reasonable scenario is you're having

21   the same back pain that every other woman has when she's

22   pregnant?

23       A     Possibly.  Possibly.

24       Q     All right.  Are you alleging that you're

25   having back pain associated with the pregnancy that's

1    because of the auto accident?

2        A    I can't say that it's 20 times worse, you

3    know, over what it normally would be.  I don't, because

4    I have never been pregnant before, so I'm unsure.

5        Q    Are you alleging that, because of this

6    accident, you have lost some type of earning capacity?

7        A    I wouldn't say I've lost.  I mean, it could

8    have affected it a little bit, but I'm, I really haven't

9    sat down and thought about it.  I mean, I don't...

10       Q    Do you plan to return to work after you have

11   the baby?

12       A    Absolutely.

13       Q    Did Dr. Duke ever tell you that you needed

14   surgery in your low back?

15            MR. HAYES:  Object to the form.

16            THE WITNESS:  I believe he told me, yes.

17   BY MR. GOBEL:

18       Q    When did he tell you that?

19       A    When we were discussing which surgery I was

20   going to have, if I was going to have my neck or my

21   lower back.

22       Q    Did he tell you any reason you couldn't do

23   both at the same time?

24            MR. HAYES:  Object to the form.

25            THE WITNESS:  I don't -- no, I think it was my

1       choice about doing, if I wanted to do both at the

2       same.  I don't think, I think I just wanted to do

3       one at the time.  I was not a fan of doing the

4       surgery.  I was hesitant.

5    BY MR. GOBEL:

6       Q    So he did tell you that you did need surgery

7    on your low back?

8       A    I believe so, yes.

9       MR. GOBEL:  All right.  I don't have any

10      further questions at this time.

11      MR. HAYES:  You have the right to read or

12      waive the deposition to make sure everything has

13      been taken down accurately.  You can't change a yes

14      to a no, but you can, if something's been

15      misspelled or anything like that, you can certainly

16      fix it.

17      I didn't really see anything in the deposition

18      to give me concern, so I would suggest that you

19      waive it.

20      THE WITNESS:  That's fine.  I'll waive it.

21      THE COURT REPORTER:  Are you going to be

22      ordering today?

23      MR. GOBEL:  Yes.

24      THE COURT REPORTER:  And is regular delivery

25      okay?

*First-Choice Reporting Services, Inc.*     **93**

1          MR. GOBEL:  Yeah, that's fine.

2          THE COURT REPORTER:  Do you need a copy?

3          MR. HAYES:  Yes, please.

4          (The deposition was concluded at 11:54 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  CERTIFICATE OF OATH

2    STATE OF FLORIDA   )
                        )
3    COUNTY OF LAKE     )

4

5          I, SUSAN L. DAVIS, Professional Court Reporter

6    and Notary Public, State of Florida, duly commissioned,

7    qualified and authorized to administer oaths and to take

8    and certify depositions, do hereby certify that the

9    above-named MELISSA CRABLE, was by me, before giving of

10   his/her deposition, first duly sworn to testify the

11   truth, the whole truth, and nothing but the truth on the

12   20th day of July, 2010.

13          WITNESS my hand and official seal this 22nd

14   day of July, 2010.

15

16

17                      _____
                        SUSAN L. DAVIS, PROFESSIONAL
                        COURT REPORTER AND NOTARY
18                      MY COMMISSION #DD 610340
                        EXPIRES:  DECEMBER 12, 2010
19                      BONDED THRU NOTARY PUBLIC
                        UNDERWRITERS
20

21

22

23

24

25

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2    STATE OF FLORIDA )
                       )
 3    COUNTY OF LAKE   )

 4

 5              I, SUSAN L. DAVIS Professional Court Reporter,
      certify that I was authorized to and did
 6    stenographically report the deposition of MELISSA
      CRABLE; that a review of the transcript was not
 7    requested; and that the deposition was later reduced to
      computer transcription under my personal supervision,
 8    and Pages 4 through 93 are a true and complete record of
      my stenographic notes.
 9
                I further certify that the deposition was taken
10    at the time and place specified herein above, and that I
      am not a relative or employee or attorney or counsel of
11    any of the parties, nor am I a relative or employee of
      any of the parties, attorney or counsel connected with
12    the action, nor am I financially interested in the
      action.
13
                DATED this 22nd day of July, 2010.
14

15

16              _____
                SUSAN L. DAVIS, PROFESSIONAL COURT
17              REPORTER, NOTARY PUBLIC, STATE
                OF FLORIDA AT LARGE
18

19

20

21

22

23

24

25
```



| STATEMENT DATE | | STATEMENT AMOUNT | ACCOUNT NBR |
|---|---|---|---|
| 04/30/10 | CONTINUED | | 2125 |

| SHOW AMOUNT PAID HERE | $ |
|---|---|

## STATEMENT

**ADDRESSEE:**

Crable, Melissa
36 Bayridge Loop
Mascotte, FL 34753

**REMIT TO:**

Millennium Medical Management LLC
8043 Spyglass Hill Road
Melbourne, FL 32940

☐ Please check box if above address is incorrect or insurance information has changed, and indicate change(s) on reverse side.

PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT
Billing dept - 321-751-3385 ext 221

| DATE | DESCRIPTION OF SERVICE | AMOUNT | INSUR BALANCE | PATIENT BALANCE | BALANCE |
|---|---|---|---|---|---|
| 02/02/09 | ENCOUNTER 13272 FOR MELISSA WITH DEUKMEDJIAN MD, ARA J | | | | |
| 02/02/09 | IME - INDEPENDENT MED EXAM () | $500.00 | | | |
| 02/09/09 | Patient Payment Check | -$500.00 | | | |
| | ENCOUNTER TOTAL | $0.00 | $0.00 | $0.00 | $0.00 |
| 04/13/09 | ENCOUNTER 15414 FOR MELISSA WITH DEUKMEDJIAN MD, ARA J | | | | |
| 04/13/09 | 99214 - OFFICE/OUTPATIENT VISIT, EST () | $441.00 | | | |
| 04/29/09 | Adj Auto Insurance | -$258.52 | | | |
| 04/29/09 | Pymt Auto Insurance | -$182.48 | | | |
| | ENCOUNTER TOTAL | $0.00 | $0.00 | $0.00 | $0.00 |
| 04/16/09 | ENCOUNTER 15575 FOR MELISSA WITH DEUKMEDJIAN MD, ARA J | | | | |
| 04/16/09 | MR - Medical Records () | $30.36 | | | |
| 05/15/09 | Patient Payment Check | -$30.36 | | | |
| | ENCOUNTER TOTAL | $0.00 | $0.00 | $0.00 | $0.00 |
| 06/08/09 | ENCOUNTER 17363 FOR MELISSA WITH DEUKMEDJIAN MD, ARA J | | | | |
| 06/08/09 | 99215 - OFFICE/OUTPATIENT VISIT, EST () | $598.00 | | | |
| 06/26/09 | Adj Auto Insurance | -$350.32 | | | |
| 06/26/09 | Pymt Auto Insurance | -$247.68 | | | |
| | ENCOUNTER TOTAL | $0.00 | $0.00 | $0.00 | $0.00 |
| 06/18/09 | ENCOUNTER 17812 FOR MELISSA WITH DEUKMEDJIAN MD, ARA J | | | | |
| 06/18/09 | MRLC - MEDICAL RECORD LASER COPY () | $25.00 | | | |
| 08/12/09 | Patient Payment Check | -$25.00 | | | |
| 06/18/09 | MRLC1 - MEDICAL RECORD LASER COPY (QTY 2) () | $100.00 | | | |
| 08/12/09 | Patient Payment Check | -$100.00 | | | |
| | ENCOUNTER TOTAL | $0.00 | $0.00 | $0.00 | $0.00 |

| ACCOUNT NBR | CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120 DAYS | TOTAL ACCOUNT BALANCE |
|---|---|---|---|---|---|---|
| 2125 | $61.36 | $0.00 | $0.00 | $0.00 | $63,174.86 | $63,236.22 |

**MESSAGE:**
Balance Over 15 Days Subject To $5.00 Late Fee Plus Finance Charge Of 1.5% Per Month (18%APR). Customer Agrees To Pay All Court Costs And Attorney Fees For Collection Efforts.  Prompt Payment Is Appreciated.  Thank You For Your Payment.

PLEASE PAY
THIS AMOUNT »»»» CONTINUED

** PAYMENT DUE UPON RECEIPT * THANK YOU *
STATEMENT



EXHIBIT
D

PAGE: 1

9 Lake Wellness & Injury
2560 E. State Rd 50 #106
Clermont, FL 34711
352-241-4111
ID#: 200965743
Tuesday May 11, 2010

Patient            : Melissa Crable #1641
Itemized Statement: 11/17/2008 - 05/11/2010
DOB                : 07/14/1978
Onset date         : 11/12/2008


            Mail to:
            Melissa Crable
            36 Bay Ridge Loop
            Mascotte FL 34753


Insured                                Insurance Carrier (primary)
Melissa Crable                         State Farm Ins
36 Bay Ridge Loop                      PO Box 9608
Mascotte FL 34753                      Winter Haven FL 33883-9618
DOB: 07/14/1908
Policy#: 59A106948

Attorney                               Employer
Daniel Newlin., PA                     Not Employed
20 N. Orange Ave, #1600
Orlando FL 32801

Current Diagnosis
722.0    Displacement Of Cervical IVD W/O Myelopathy
722.10   Displacement Of Lumbar IVD W/O Myelopathy
723.4    Brachial Neuritis/Radiculitis NOS
847.1    Sprain/Strain Thoracic

_____

            PLEASE PAY AMOUNT INDICATED BELOW AS "PATIENT BALANCE".

| Date | Description | Amount |
|------|-------------|--------|
| 11/17/08 | 99203 25 New Pt Detailed Exam/Eval | $ 210.00 |
| 11/17/08 | 95851 Range of Motion-ech trnk section | $ 140.00 |
| 11/17/08 | 95999 Static Scanning SEMG | $ 50.00 |
| 11/25/08 | 72052 Xray-cervical-5 view | $ 200.00 |
| 11/25/08 | 72070 Xray-Thoracic- 2 view | $ 120.00 |
| 11/25/08 | 72100 Xray - Lumbar - 2 Views | $ 120.00 |
| 11/25/08 | E0230 Large ice pack | $ 16.00 |
| 11/25/08 | 99070 CryoDerm Spray | $ 15.00 |
| 11/25/08 | 99213 25 Estb Pt Detailed Exam/Eval | $ 110.00 |
| 12/03/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 12/03/08 | 97124 59 Massage, Linda | $ 50.00 |
| 12/10/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 12/10/08 | 97124 59 Massage, Linda | $ 50.00 |
| 12/10/08 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 12/10/08 | 97110 Exercises, theraputic | $ 60.00 |
| 12/10/08 | 97012 Traction | $ 50.00 |
| 12/11/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 12/11/08 | 97124 59 Massage, Linda | $ 50.00 |
| 12/11/08 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 12/11/08 | 97110 Exercises, theraputic | $ 60.00 |
| 12/11/08 | 97012 Traction | $ 50.00 |
| 12/12/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 12/12/08 | 97124 59 Massage, Linda | $ 100.00 |
| 12/12/08 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 12/12/08 | 97110 Exercises, theraputic | $ 60.00 |
| 12/12/08 | 97012 Traction | $ 50.00 |
| 12/16/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 12/16/08 | 97124 59 Massage, Linda | $ 100.00 |
| 12/16/08 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 12/16/08 | 97110 Exercises, theraputic | $ 60.00 |

EXHIBIT

E

| Date | Description | Amount |
|---|---|---|
| 2/16/08 | 97012 Traction | $ 50.00 |
| 2/17/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 2/17/08 | 97124 59 Massage, Linda | $ 50.00 |
| 2/17/08 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 2/17/08 | 97110 Exercises, theraputic | $ 60.00 |
| 2/17/08 | 97012 Traction | $ 50.00 |
| 2/19/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 2/19/08 | 97124 59 Massage, Linda | $ 50.00 |
| 2/19/08 | 97110 Exercises, theraputic | $ 60.00 |
| 2/19/08 | 97012 Traction | $ 50.00 |
| 2/22/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 2/22/08 | 97110 Exercises, theraputic | $ 60.00 |
| 2/22/08 | 97012 Traction | $ 50.00 |
| 2/23/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 2/23/08 | 97110 Exercises, theraputic | $ 60.00 |
| 2/23/08 | 97012 Traction | $ 50.00 |
| 2/29/08 | Payer payment Chk#119143... applied to svcs: 12/10/08 - 12/10/08 | $ -226.66 |
| 2/29/08 | Payer payment Chk#119143... applied to svcs: 12/11/08 - 12/11/08 | $ -226.66 |
| 2/29/08 | Payer payment Chk#119144... applied to svcs: 12/12/08 - 12/12/08 | $ -269.26 |
| 2/30/08 | Payer payment Chk#119195... applied to svcs: 12/16/08 - 12/16/08 | $ -269.26 |
| 2/30/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 2/30/08 | 97110 Exercises, theraputic | $ 60.00 |
| 2/30/08 | 97012 Traction | $ 50.00 |
| 12/30/08 | 97124 59 Massage, Linda | $ 50.00 |
| 12/31/08 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 12/31/08 | 97110 Exercises, theraputic | $ 60.00 |
| 12/31/08 | 97012 Traction | $ 50.00 |
| 12/31/08 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 01/05/09 | Payer payment Chk#119197... applied to svcs: 12/17/08 - 12/17/08 | $ -226.66 |
| 01/06/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 01/06/09 | 97110 Exercises, theraputic | $ 60.00 |
| 01/06/09 | 97012 Traction | $ 50.00 |
| 01/06/09 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 01/06/09 | 97124 59 Massage, Linda | $ 50.00 |
| 01/07/09 | Payer payment Chk#119197... applied to svcs: 11/17/08 - 11/17/08 | $ -180.42 |
| 01/07/09 | Payer payment Chk#119197... applied to svcs: 11/25/08 - 11/25/08 | $ -397.62 |
| 01/07/09 | Payer payment Chk#119197... applied to svcs: 12/03/08 - 12/03/08 | $ -90.18 |
| 01/08/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 01/08/09 | 97110 Exercises, theraputic | $ 60.00 |
| 01/08/09 | 97012 Traction | $ 50.00 |
| 01/08/09 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 01/08/09 | 97124 59 Massage, Linda | $ 100.00 |
| 01/12/09 | 95851 Range of Motion-ech trnk section | $ 140.00 |
| 01/12/09 | 95999 Static Scanning SEMG | $ 50.00 |
| 01/12/09 | 97124 59 Massage, Linda | $ 50.00 |
| 01/12/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 01/12/09 | 99070 CryoDerm Spray | $ 15.00 |
| 01/26/09 | Payer payment Chk#119133... applied to svcs: 12/19/08 - 12/19/08 | $ -171.50 |
| 01/27/09 | Payer payment Chk#119134... applied to svcs: 12/22/08 - 12/23/08 | $ -257.80 |
| 01/27/09 | Payer payment Chk#119134... applied to svcs: 12/30/08 - 12/30/08 | $ -171.50 |
| 01/27/09 | Payer payment Chk#119134... applied to svcs: 12/31/08 - 12/31/08 | $ -184.06 |
| 01/29/09 | 97012 Traction | $ 50.00 |
| 01/29/09 | 97039 Hydro Therapy | $ 50.00 |
| 01/30/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 02/05/09 | Payer payment Chk#119118... applied to svcs: 11/25/08 - 11/25/08 | $ -16.97 |
| 02/05/09 | Payer payment Chk#119119... applied to svcs: 01/06/09 - 01/06/09 | $ -243.11 |
| 02/05/09 | Payer payment Chk#119119... applied to svcs: 01/08/09 - 01/08/09 | $ -269.27 |
| 02/05/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 02/05/09 | 97012 Traction | $ 50.00 |
| 02/05/09 | 97039 Hydro Therapy | $ 50.00 |
| 02/06/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 02/06/09 | 97012 Traction | $ 50.00 |
| 02/10/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 02/10/09 | 97012 Traction | $ 50.00 |
| 02/10/09 | 97039 Hydro Therapy | $ 50.00 |
| 02/13/09 | Payer payment Chk#119449... applied to svcs: 01/12/09 - 01/12/09 | $ -92.70 |
| 02/13/09 | Payer payment Chk#119044... applied to svcs: 12/16/08 - 12/16/08 | $ -16.95 |
| 02/13/09 | Interest charge | $ 16.95 |
| 02/19/09 | Payer payment Chk#119466... applied to svcs: 01/29/09 - 01/29/09 | $ -43.76 |
| 03/02/09 | Payer payment Chk#119402... applied to svcs: 02/06/09 - 02/10/09 | $ -169.72 |
| 03/02/09 | Payer payment Chk#119402... applied to svcs: 01/30/09 - 02/05/09 | $ -140.96 |
| 03/04/09 | 97012 Traction-Neck | $ 50.00 |
| 03/04/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 03/10/09 | 97012 Traction-Neck | $ 50.00 |
| 03/10/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |

| Date | Description | Amount |
|---|---|---|
| 03/23/09 | Payer payment Chk#119573... applied to svcs: 01/12/09 - 01/12/09 | $ -60.41 |
| 03/23/09 | Interest charge | $ 12.96 |
| 03/23/09 | Payer payment Chk#119573... applied to svcs: 01/12/09 - 01/12/09 | $ -12.96 |
| 03/24/09 | Payer payment Chk#119296... applied to svcs: 03/04/09 - 03/04/09 | $ -77.36 |
| 03/30/09 | PIP insurance adj applied to svcs: 03/10/09 - 03/10/09 | $ -77.36 |
| 03/30/09 | PIP insurance adj applied to svcs: 11/17/08 - 11/17/08 | $ -219.58 |
| 03/30/09 | PIP insurance adj applied to svcs: 11/25/08 - 11/25/08 | $ -166.41 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/03/08 - 12/03/08 | $ -24.82 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/10/08 - 12/10/08 | $ -68.34 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/11/08 - 12/11/08 | $ -68.34 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/12/08 - 12/12/08 | $ -75.74 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/16/08 - 12/16/08 | $ -75.74 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/17/08 - 12/17/08 | $ -68.34 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/19/08 - 12/19/08 | $ -53.50 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/22/08 - 12/23/08 | $ -92.20 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/30/08 - 12/30/08 | $ -53.50 |
| 03/30/09 | PIP insurance adj applied to svcs: 12/31/08 - 12/31/08 | $ -60.94 |
| 03/30/09 | PIP insurance adj applied to svcs: 01/06/09 - 01/06/09 | $ -51.89 |
| 03/30/09 | PIP insurance adj applied to svcs: 01/08/09 - 01/08/09 | $ -75.73 |
| 03/30/09 | PIP insurance adj applied to svcs: 01/12/09 - 01/12/09 | $ -166.89 |
| 03/30/09 | PIP insurance adj applied to svcs: 01/29/09 - 01/29/09 | $ -56.24 |
| 03/30/09 | PIP insurance adj applied to svcs: 01/30/09 - 02/05/09 | $ -89.04 |
| 03/30/09 | PIP insurance adj applied to svcs: 02/06/09 - 02/10/09 | $ -110.28 |
| 03/30/09 | PIP insurance adj applied to svcs: 03/04/09 - 03/04/09 | $ -37.64 |
| 03/30/09 | PIP insurance adj applied to svcs: 03/10/09 - 03/10/09 | $ -37.64 |
| 04/21/09 | 97012 Traction-Neck | $ 50.00 |
| 04/21/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 04/21/09 | 97039 Hydro Therapy | $ 50.00 |
| 05/26/09 | Payer payment Chk#119782... applied to svcs: 04/21/09 - 04/21/09 | $ -92.36 |
| 05/26/09 | PIP insurance adj applied to svcs: 04/21/09 - 04/21/09 | $ -72.64 |
| 06/03/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 06/03/09 | 71020 Xray-Chest- 2 views,frontal and lateral | $ 80.00 |
| 06/17/09 | Payer payment Chk#119496... applied to svcs: 06/03/09 - 06/03/09 | $ -115.32 |
| 06/17/09 | PIP insurance adj applied to svcs: 06/03/09 - 06/03/09 | $ -29.68 |
| 07/01/09 | 99211 25 Estb Pt Focused Exam/Eval | $ 60.00 |
| 07/01/09 | 97014 Electrical Muscle Stimulation | $ 40.00 |
| 07/01/09 | 97110 59 Exercises, theraputic | $ 60.00 |
| 07/08/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 07/08/09 | E0230 Large ice pack | $ 16.00 |
| 07/13/09 | 97124 Massage, Linda (1) unit | $ 50.00 |
| 07/16/09 | 97124 59 Massage Linda (2) units | $ 100.00 |
| 07/16/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 07/16/09 | 97110 59 Exercises, theraputic | $ 60.00 |
| 07/16/09 | 97014 Electrical Muscle Stimulation | $ 40.00 |
| 07/21/09 | Payer payment Chk#119164... applied to svcs: 07/01/09 - 07/01/09 | $ -117.54 |
| 07/21/09 | PIP insurance adj applied to svcs: 07/01/09 - 07/01/09 | $ -42.46 |
| 07/21/09 | 97124 59 Massage Linda (2) units | $ 100.00 |
| 07/21/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 07/21/09 | 97110 59 Exercises, theraputic | $ 60.00 |
| 07/21/09 | 97014 Electrical Muscle Stimulation | $ 40.00 |
| 07/22/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 07/22/09 | 97110 59 Exercises, theraputic | $ 60.00 |
| 07/22/09 | 97014 Electrical Muscle Stimulation | $ 40.00 |
| 07/22/09 | 97124 59 Massage, Linda (1) unit | $ 50.00 |
| 07/28/09 | Payer payment Chk#119513... applied to svcs: 07/08/09 - 07/08/09 | $ -64.60 |
| 07/28/09 | PIP insurance adj applied to svcs: 07/08/09 - 07/08/09 | $ -16.40 |
| 07/28/09 | Payer payment Chk#119513... applied to svcs: 07/13/09 - 07/13/09 | $ -44.10 |
| 07/28/09 | PIP insurance adj applied to svcs: 07/13/09 - 07/13/09 | $ -5.90 |
| 07/28/09 | 97124 59 Massage Linda (2) units | $ 100.00 |
| 07/28/09 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 07/28/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 07/28/09 | 97110 59 Exercises, theraputic | $ 60.00 |
| 07/28/09 | A9300 Exercise ball 55cm | $ 45.00 |
| 08/04/09 | Payer payment Chk#119232... applied to svcs: 07/16/09 - 07/16/09 | $ -215.78 |
| 08/04/09 | PIP insurance adj applied to svcs: 07/16/09 - 07/16/09 | $ -49.22 |
| 08/14/09 | Payer payment Chk#119197... applied to svcs: 07/21/09 - 07/21/09 | $ -215.78 |
| 08/14/09 | PIP insurance adj applied to svcs: 07/21/09 - 07/21/09 | $ -49.22 |
| 08/14/09 | Payer payment Chk#119197... applied to svcs: 07/22/09 - 07/22/09 | $ -171.68 |
| 08/14/09 | PIP insurance adj applied to svcs: 07/22/09 - 07/22/09 | $ -43.32 |
| 08/14/09 | 97112 59 Neuromuscular reeducation of movement | $ 70.00 |
| 08/14/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 08/14/09 | 97110 59 Exercises, theraputic | $ 60.00 |
| 08/14/09 | 97039 Hydro Therapy | $ 50.00 |
| 08/14/09 | 97014 Electrical Muscle Stimulation | $ 40.00 |
| 08/31/09 | Payer payment Chk#119227... applied to svcs: 07/28/09 - 07/28/09 | $ -249.48 |

| Date | Description | Amount |
|---|---|---|
| 08/31/09 | PIP insurance adj applied to svcs: 07/28/09 - 07/28/09 | $ -90.52 |
| 09/16/09 | Payer payment Chk#119261... applied to svcs: 08/14/09 - 08/14/09 | $ -199.32 |
| 09/16/09 | PIP insurance adj applied to svcs: 08/14/09 - 08/14/09 | $ -85.68 |
| 09/16/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 10/05/09 | Payer payment Chk#119302... applied to svcs: 09/16/09 - 09/16/09 | $ -48.60 |
| 10/05/09 | PIP insurance adj applied to svcs: 09/16/09 - 09/16/09 | $ -16.40 |
| 10/21/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 10/23/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 10/23/09 | Payer payment Chk#119235... applied to svcs: 10/05/09 - 10/05/09 | $ -48.60 |
| 10/23/09 | PIP insurance adj applied to svcs: 10/05/09 - 10/05/09 | $ -16.40 |
| 10/30/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 11/06/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 11/09/09 | Payer payment Chk#119645... applied to svcs: 10/21/09 - 10/21/09 | $ -48.60 |
| 11/09/09 | PIP insurance adj applied to svcs: 10/21/09 - 10/21/09 | $ -16.40 |
| 11/16/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 12/11/09 | Payer payment Chk#119707... applied to svcs: 10/30/09 - 11/06/09 | $ -97.20 |
| 12/11/09 | PIP insurance adj applied to svcs: 10/30/09 - 11/06/09 | $ -32.80 |
| 12/11/09 | Payer payment Chk#119707... applied to svcs: 11/16/09 - 11/16/09 | $ -48.60 |
| 12/11/09 | PIP insurance adj applied to svcs: 11/16/09 - 11/16/09 | $ -16.40 |
| 12/16/09 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 01/15/10 | 98940 Spinal Adjustment - 1 or 2 Areas | $ 65.00 |
| 01/18/10 | Payer payment Chk#119672... applied to svcs: 12/16/09 - 12/16/09 | $ -48.60 |
| 01/18/10 | PIP insurance adj applied to svcs: 12/16/09 - 12/16/09 | $ -16.40 |
| 02/08/10 | Payer payment Chk#119809... applied to svcs: 01/15/10 - 01/15/10 | $ -47.58 |
| 02/08/10 | PIP insurance adj applied to svcs: 01/15/10 - 01/15/10 | $ -17.42 |

```
Total Sales Tax         : $      0.00
Total Late Charges      : $      0.00
Total Interest Charges  : $     29.91
Patients-Cash Rcvd      : $      0.00
Patients-Chks Rcvd      : $      0.00
Patients-Crdt Crd       : $      0.00
Payer Payments          : $   5766.85
PIP insurance adj       : $   2270.06

Total Charges           : $   8036.91
Total Received          : $   5766.85
Total Adjustment        : $   2270.06
Balance (based on search) : $   -0.00
```

4/7/2009
9:17:18AM

## Special Damages

### 180677 - Crable, Melissa vs. Dickson, Diana
### Crable, Melissa

| Provider / Dates of Service Date Paid | Type | Total Charges | Date of LOP | Lien Amount Date Sent | Date Due Account Number | Bill/Report Requested | Bill? Deduct? |
|---|---|---|---|---|---|---|---|
| ████████████ | | | | | (352) 242-2111 | | ☒ |
| ████████████ Clermont FL 34711 | | $5,286.00 | | | | | |
| SUBTOTAL: | | $5,286.00 | | | | | |
| ████████████ P.O. Box 628298 Orlando FL 32862-8298 | | $209.00 | | | (888) 888-9999 | | ☐ |
| SUBTOTAL: | | $209.00 | | | | | |
| ████████████ P.O. Box ███ Orlando FL 32807 | | $2,696.45 | | | (407) 180-5250 | | ☐ |
| SUBTOTAL: | | $2,696.45 | | | | | |
| ████████████ Clermont FL 34711 | | $583.00 | | | (352) 390-4070 | | ☐ |
| SUBTOTAL: | | $583.00 | | | | | |
| | | **TOTAL:** $8,774.45 | | | | | |

End of report

EXHIBIT
F